# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### 1:04cv278

| | | |
|---|---|---|
| MARK DAUGHERTY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| FOOD LION, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**THIS MATTER** is before the court on defendant's Motion for Summary Judgment and plaintiff's Motion for Hearing. Plaintiff timely filed a memorandum in opposition, which included evidentiary materials. Defendant has timely filed a reply. Having considered all materials of record, and finding that oral arguments will not aid the decision-making process inasmuch as the issues have been thoroughly and exhaustively briefed, the undersigned will deny plaintiff's request for a hearing and enter the following findings, conclusions, and Recommendation.

## FINDINGS AND CONCLUSIONS

### I.     Background

### A.     Plaintiff's Claims

In this action, plaintiff claims that he was discriminated against in his employment as a grocery store stocker at a Food Lion store in Brevard, North Carolina. Plaintiff contends that the discrimination was based on his race, African-American, and took the form of racial discrimination in employment decisions, interference with contractual rights, creation of a hostile work environment, retaliation, wrongful discipline, negligence, and intentional

infliction of emotional distress.

As a prerequisite to filing his Title VII claims in this court, plaintiff filed two administrative charges of discrimination with the Equal Employment Opportunity Commission. The first charge was filed approximately three months after he commenced his work with Food Lion, and the second, claiming retaliation for filing the first, was filed four months thereafter. The claims asserted in his Verified Complaint include the following:

(1)      a Title VII and Section 1981 claim for racial discrimination;

(2)      a Title VII claim for retaliation for exercising his rights under Title VII;

(3)      a Title VII claim for disparate treatment and impact;

(4)      a Title VII claim for constructive discharge;

(5)      a Section 1981 claim for "wrongful discipline";

(6)      a supplemental private cause of action for racial discrimination in violation of the North Carolina Equal Employment Practices Act ("NCEEPA");

(7)      a supplemental claim for negligent supervision; and

(8)      a supplemental claim for intentional infliction of emotional distress.

Complaint, Docket Entry 1. Defendant timely responded to these verified claims by way of Answer, and therein gave notice that it would seek its fees, costs, and expenses. Docket Entry 4, at 24.

### B.      Plaintiff's Employment with Food Lion

Immediately prior to his brief employment with Food Lion, plaintiff was engaged in the floor cleaning business, working for a private contractor or contractors for approximately 20 years. Such work took plaintiff away from his home in Brevard by requiring him to travel to towns in adjoining counties and states. Plaintiff's Depo., Vol. I, at 16-17. For 12 years, plaintiff cleaned floors at a number of Food Lion stores, including Food Lion Number 291

in Brevard. Plaintiff's Depo., Vol. I, at 18. As a result of such work, plaintiff became friends with a number of Food Lion employees, including Store 291's manager Jeff Brandt, grocery manager Rich Redmond, and assistant manager Kim Pegg. Plaintiff's Depo., Vol. I, at 18.

In late 2003, plaintiff desired to spend more time at home and avoid the travel required by the floor cleaning business. He wanted to work the night shift at Food Lion. He spoke with Brandt and Redmon about employment with Food Lion, and asked them if they would write letters of recommendation for him. Plaintiff's Depo., Vol. I, at 23. Brandt and Redmon both agreed to write letters of recommendation for him and in fact wrote such letters. Id.

In October 2003, plaintiff visited Store 291 and filled out an application, and turned it in to Brandt. According to plaintiff, Brandt immediately told him that "he was gonna hire me because he needed good help . . . and he said he was gonna need somebody on the night shift that was responsible." Plaintiff's Depo., Vol. I, at 27.

Brandt did just what he said he would do, hiring plaintiff for the position of stocker, which is the position for which he applied. Id. On his application, plaintiff put down as references Brandt, Redmon, and Richard Bartolet (a stocker), noting that they were his "friends." Plaintiff's Depo., Vol. I, Ex. 2.

Although plaintiff was hired for the new Food Lion Store 2588, he immediately began work at Store 291 in November 2003. Plaintiff's Depo., Vol. I, at 28. Plaintiff worked for three days at Store 291, and thereafter worked at Store 2588 in preparation for its grand opening. Unlike Store 291, Store 2588 was supposed to be open 24 hours a day and plaintiff testified that Brandt told him they were going to make plaintiff "night manager." Plaintiff's Depo., Vol. I, at 41-42. This alleged promise will later become a point of contention with plaintiff.

When Store 2588 opened in December 2003, plaintiff began working the overnight shift stocking shelves. Plaintiff's Depo., Vol. I, at 53-54. Rather than being named "night manager," plaintiff was designated as the "Person in Charge" ("PIC") of the night shift, Plaintiff's Depo., Vol. I, at 114, 118, which Food Lion considers to be a position of responsibility. Brandt Aff., at ¶ 7. Being designated as a PIC, however, does not relive that person from his or her regular duties. Plaintiff's Depo., Vol. I, at 63, 72. The PIC assists cashiers with any register problems, including overrides and voids and is given an override key for that purpose, and is responsible for the store when other management personnel are not available. Brandt Aff., at ¶ 7. Plaintiff was selected as the PIC over his friend Bartolet, a Caucasian coworker, who had worked at Food Lion for a number of years. Plaintiff's Depo., Vol. I, at 65-66; Brandt Aff., at ¶ 5. While plaintiff contends that he was hired as "night manager," there is no evidence in the record that he ever applied for such a position or that such position exists within the chain of Food Lion stores. Plaintiff's Depo., Vol. II, at 69-70.

Plaintiff's primary contention is not with the title, but with not receiving a set of keys to Store 2588, which he thought would go with the title. The record is undisputed that Food Lion only issued four sets of keys for Store 2588 for security reasons, and that those keys went to the store manager, the assistant store manager, the customer service manager, and the grocery manager. Brandt Aff., at ¶ 15; Plaintiff's Depo., Vol. I, at 56, 61, & 62. No other managers received keys, including the deli, meat, and produce managers, all of whom were Caucasians. Plaintiff's Depo., Vol. I, at 61. Bartolet, who subsequently became the PIC, was also not issued keys. Plaintiff's Depo., Vol. I, at 116.

Plaintiff further clarified his grievance at his deposition when he testified that his concern was not so much with not being issued keys, but with Brandt's being "evasive" about

why the plaintiff had not been issued keys. Plaintiff's Depo., Vol. I, at 120, Vol. II, at 69-70. Apparently, plaintiff believed that Brandt discovered he had made a mistake in promising plaintiff a position that did not exist and was too embarrassed to admit he had made a mistake. Id.

As a PIC, plaintiff was treated in all regards as a managerial level employee. His starting wage was $9.50 per hour, which was only 50 cents less than Bartolet was making in the same stocker position with 13 years seniority at Food Lion, and $1 more per hour than other Caucasian stockers. Brandt Aff., at ¶ 5; Plaintiff's Depo., Vol. I, at 31, 175-176. Plaintiff was trained by Brandt on how to use the alarm system and given alarm codes, was given an override key and number, and clocked in and out of work in the same manner as all other managerial employees. Plaintiff's Depo., Vol. I, at 54, 57, 69, & 71. All other employees (including plaintiff himself) as well as other managers recognized that plaintiff was a management-level employee, and plaintiff admits that the only thing he did not receive which he thought he was supposed to receive as a manager were keys to the store, Plaintiff's Depo., Vol. II, at 23, 27, and perhaps the title of "night manager," which he admits did not exist. Id. Plaintiff's frustration over not receiving keys came to a head in December 2003, soon after he began his work and soon after the new store opened. When plaintiff threatened to resign over the issue of keys, Brandt convinced him to stay and told him he would attempt to get him a set of keys. Plaintiff's Depo., Vol. I, at 179-180.

Even though plaintiff testified that he timely complete all assigned work, and that all work assigned was well within his job duties, he appears to complain as to the amount of work he was asked to do and oversight of such work by his supervisors. It is undisputed that Food Lion does not require stockers to unload trucks or even put pallets on floats. Instead, the cases are placed by others on floats, and stockers are responsible for guiding products out

on the floor on these floats. They then remove the goods from cases, stocking them on various shelves or displays. Plaintiff does not allege or testify that he was ever required to do any task outside the role of stocker.

In December 2003, plaintiff worked one truck per week and Bartolet worked three. Plaintiff's Depo., Vol. I, at 75. When the store first opened, the stocking crew consisted of five people. By January 2004, this crew had been reduced to two - -plaintiff and Bartolet - - because the number of trucks had been reduced to three. Plaintiff's Depo., Vol. I, at 48-49, & 76.

Plaintiff also contends that he was discriminated against based on his race because he was required to work for two weeks without a day off, that he was made to stock frozen foods, and that his hours were reduced. While plaintiff apparently did not know this at the time he was working at Food Lion and when he filed this action, Bartolet was actually required to work 16 days straight due to the opening of the new store. Brandt Aff., at ¶ 4. When the plaintiff complained that he did not want to stock frozen food, he was reassigned and was not required to work in that area. Plaintiff's Depo., Vol. I., at 168-69; Brandt Aff., at ¶ 6.

In May 2004, Food Lion ceased operating Store 2588 twenty-four hours per day because the volume of business was less than Food Lion had anticipated. Brandt Aff., at ¶ 16; Plaintiff's Depo., Vol. I, at 65. Rather than terminate plaintiff's employment, defendant shifted plaintiff to the day shift, but did not decrease his pay. Brandt Aff., at ¶ 17. Plaintiff has not countered defendant's showing that his request to not work in frozen foods was accommodated by shifting those duties to others and that his reduction in hours was in fact an accommodation of his own request. See Brandt Aff., at ¶ 6.

It is undisputed that defendant has written employment policies in place designed to

prevent and discourage discrimination and harassment, which are contained in its employee handbook. Plaintiff's Depo., Vol. I, at Ex.4. Plaintiff received such handbook when he was hired and signed a certification acknowledging that he had read and understood such handbook. Plaintiff's Depo., Vol. I, at 23, 33 & 77. It is undisputed that defendant provides at least three phone numbers for employees to report unlawful conduct and seek assistance. Plaintiff's Depo., Vol. I, at Ex.4, at 2 & 17.

In October 2005, this court conducted a discovery hearing on plaintiff's Motion to Compel production of phone records concerning such hotlines to substantiate his contention that he had called to complain about racial discrimination. The court compelled defendant to search and produce any such toll records that would show calls to the hotlines from any telephone or cell number plaintiff could provide. Plaintiff testified, however, that he never utilized such lines to complain about alleged discrimination or retaliation, Plaintiff's Depo., Vol. I, at 186, and later gave notice that he had no number to provide. <u>See</u> Response to Request for Information.

### C. Plaintiff's Administrative Claims of Discrimination, Alleged On the Job Injury, and Worker's Compensation Claim

Beginning in February 2004, plaintiff filed a number of employment related claims. On February 19, 2004, plaintiff filed his first charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff's Depo., Vol. I, at Ex. 15. That charge consisted of six typed pages of charges concerning his approximately three months of employment with Food Lion. Defendant participated in the conciliation process on that charge by investigating the allegations. Cheryl Carrington Affidavit, at ¶¶ 4,6. Food Lion interviewed plaintiff's supervisors as well as coworkers and were unable to substantiate his claims. <u>Id.</u> In this action, plaintiff has testified that the only actual problem he had with Brandt was him not giving him a set of keys and then being evasive as to why he would not

give him a set, and that Brandt had not done anything wrongful, discriminatory, or harassing to him. Plaintiff's Depo., Vol. I, at 183. Plaintiff further testified that the communication problems he had with Pegg were not race related, Plaintiff's Depo., Vol. II, at 29 & 146, and that Redmon never did anything to him at all that was discriminatory or harassing. Plaintiff's Depo., Vol. I, at 147. While plaintiff admits that he never heard a racially derogatory remark, Plaintiff's Depo., Vol. I, at 125, he testified that he only believed he was suffering unlawful discrimination when a former Food Lion employee , Jason Ryall, told him that Pegg and Redmon made racially derogatory remarks about him. Plaintiff's Depo., Vol. I, at 124, Another former employee, Jason Gravely, also testified that Brandt made racially derogatory remarks about another person. See Deposition of Jason Gravley, at 23. Gravely even testified that Bartolet made racially derogatory remarks *to* plaintiff, Gravley Depo., at 25, 50, & 51, which is inconsistent with even plaintiff's own testimony.[1]

On February 28, 2004, plaintiff left work on medical leave and did not return until April 19, 2004. Plaintiff avers that he left work during that period due to severe emotional distress. Verified Complaint, at ¶ 43.

After returning to work on or about April 19, 2004, plaintiff avers that he sustained an on-the-job injury that left him unable to work by June 1, 2004. Id., at ¶¶ 45, 54. Plaintiff testified that the only reason he has not returned to work since June 1, 2004, is that he is no longer physically able to perform his job as a stocker. Plaintiff's Depo., Vol. I, at 191. According to defendant, Food Lion still considers plaintiff to be an employee on inactive status. Brandt Aff., at ¶ 18.

On July 7, 2004, plaintiff filed his second charge of discrimination with the EEOC alleging retaliation for filing the first charge. Plaintiff's Depo., Vol. I, Ex. 22. Plaintiff

---

[1] The court notes that Mr. Gravley admits in his deposition to being a racist.

contended in the second charge that when he returned to work after filing the first charge, he was wrongfully disciplined through the assignment of excessive labor designed to cause him physical injury. Specifically, plaintiff considered being assigned to work trucks alone was punishment for exercising his rights and intended to cause him physical injury, Verified Complaint, at ¶¶ 48, 66, that Pegg required him to sign a list of tasks that had been assigned and whether each task had been completed, id., at ¶ 44, and that Redmon counted the number of boxes he stocked. Id., at ¶ 53,. Plaintiff testified, however, that a case count was only done on one occasion, Plaintiff's Depo., Vol. I, at 206-207, that he did not know whether white stockers' cases were counted, id., and that he did not know whether management left similar check off lists for white stockers. Plaintiff's Depo., Vol. I, at 209. It is undisputed that white stockers also received the same lists. Brandt Aff., at ¶ 9. It is also undisputed that on February 24, 2004, Pegg told both plaintiff and Bartolet to let her know if she ever left them too much work to do and that she would adjust it. Plaintiff's Depo., Vol. I, at 207-08. Plaintiff admits that there was never an occasion when he was unable to finish the work assigned within his shift. Id., at 209.

Plaintiff also claims that he was shunned by other employees after he filed his first charge of discrimination. Plaintiff's Depo., Vol. I, at 149. Plaintiff noted in his personal journal, Plaintiff's Depo., Vol. I, at Ex. 20, that meat manager Louis Stepp (Pegg's father) did not respond on February 24, 2004, when plaintiff said "good morning," which was two days after he hade filed the EEOC charge. Plaintiff's Depo., Vol. I, at 149-50. Pegg, he claims, would not make eye contact with him and generally ignored him.

Plaintiff appears to contend that defendant improperly opposed his Worker's Compensation claim in retaliation for the charges of discrimination. Verified Complaint, at 55. Finally, plaintiff argues in his responsive brief that Food Lion decided to cease operating

Store 2588 twenty-four hours a day not for a legitimate business reason, but to retaliate against him.

## II.  Standard Applicable to a Summary Judgment Motion

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial.  Upon the moving party's meeting that burden, the non-moving party has the burden of persuasion to establish that there is a genuine issue for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.  In the language of the Rule, the nonmoving [sic] party must come forward with "specific facts showing that there is a *genuine issue for trial*."  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted; emphasis in the original) (quoting Fed. R. Civ. P. 56).  There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts.  Anderson, supra.  "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment."  Id. at 248.  A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party."  Id.  The court must credit factual disputes in favor of the party resisting summary judgment and draw inferences favorable to that party if the inferences are reasonable, however improbable they may seem.  Cole v. Cole, 633 F.2d 1083, 1092 (4th Cir. 1980).  Affidavits filed in support of a defendant's Motion for Summary Judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves.  United States ex rel. Jones v. Rundle, 453 F.2d

147 (3d Cir. 1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. Davis v. Zahradnick, 600 F.2d 458 (4th Cir. 1979).

In determining whether a genuine issue of material fact exists, the admissible evidence of the non-moving party must be believed and all justifiable inferences must be drawn in his or her favor. Anderson, supra, at 255. In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." Id., at 252.

## III. Discussion

At the close of discovery, defendant has moved for entry of summary judgment in accordance with Rule 56(b), Federal Rules of Civil Procedure, contending that plaintiff cannot satisfy his obligation of showing a *prima facie* case of a race-based discrimination, a hostile work environment, that he was subjected differential treatment in his employment, or that the conditions of his employment were racially motivated or in retaliation for engaging in protected activities. Further, defendant has moved for summary judgment on the supplemental state law claims. Each claim will be addressed below.

### A. First Cause of Action[2] "Racial Discrimination" and Fourth Cause of Action "Employment Discrimination–Constructive Discharge."

Plaintiff asserts his first cause of action for "Racial Discrimination" under 42, United States Code, Section 1981, and under Title VII of the Civil Rights Action of 1964. Inasmuch as his Fourth Cause of Action for "Employment Discrimination–Constructive Discharge" is a hostile work environment claim that is also based on an alleged substantive violation of

---

[2] Plaintiff has not numbered his causes of action.

Title VII, these claims will be discussed together.

### 1. Establishing a *Prima Facie* Case

By asserting claims for "Racial Discrimination," "Employment Discrimination," and "Constructive Discharge," plaintiff appears to be contending in the first instance that he was treated differently in his employment because of his race and, second, that his employment was made unbearable through the creation of a hostile work environment.

### a. Hostile Work Environment Claim

On a claim of a hostile work environment, plaintiff must present evidence upon which a reasonable finder of fact could return a verdict in his favor on each of the following elements:

(1)     he was harassed because of his race;

(2)     the harassment was unwelcome;

(3)     the harassment was sufficiently severe or pervasive to create a hostile work environment; and

(4)     some basis exists for imputing liability to the employer.

Spriggs v. Diamond Auto Glass, 242 F.3d 179 (4th Cir 2001).

### 1. Plaintiff has Presumably Satisfied the First Two Elements

For the limited purpose of this motion, the court will presume without deciding that plaintiff has satisfied the first two elements as to his hostile work environment claim.

### 2. Plaintiff has not Satisfied the Third Element

To satisfy the third element of a hostile work environment claim, plaintiff must come forward with evidence tending to show that he was subject to harassment that was sufficiently severe or pervasive so as to create a hostile work environment. Plaintiff has

presented evidence that former co-workers overheard managers and another co-worker refer to plaintiff behind his back using the racial epitaph "nigger."   Plaintiff has also testified that he never heard such racial epitaphs being used and it would appear that he filed his first EEOC claim three days before he ever learned that such language was supposedly being used.

"Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace." Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 754 (4th Cir.), cert. denied, 117 S. Ct. 70 (1996).  Rather, its purpose is to protect a "reasonable person" from an environment in which abuse is sufficiently severe or pervasive as to alter the conditions of his or her employment.  Id., at 753 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 19 (1993), and Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)).

In the context of summary judgment, the issue is whether hearsay evidence of use of racially derogatory language in referring to plaintiff behind his back is sufficient as a matter of law to warrant trial.  In Hartsell v. Duplex Products, Inc., 123 F.3d 766 (4th Cir. 1997), the appellate court held that Title VII "prohibits only harassing behavior that is so severe and pervasive as to render the workplace objectively hostile." Id., at 773.  In Harris v. Forklift Systems, Inc., supra, the Supreme Court held that isolated comments are simply not enough to give rise to a Title VII claim of unlawful harassment. Severe conduct is conduct that would be extreme, amounting to a change in the terms and conditions of employment. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75 (1998).

First, the use of the term "nigger" is never acceptable and is a term that any reasonable, civil person would find objectionable and offensive.   As the Court of Appeals for the Fourth Circuit has found:

> Far more than a "mere offensive utterance," the word "nigger" is pure anathema to African-Americans. Perhaps no single act can more quickly alter

the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates.

Spriggs v. Diamond Auto Galss, 242 F.3d 179, 185 (4th Cir. 2001)(citations and corresponding quotation marks omitted). Spriggs was, however, exposed personally to racist comments on a "'continuous daily' basis . . . ." Id., at 184. In this case, plaintiff was never subjected personally to any racist or discriminatory comments. Plaintiff was not even aware of such alleged comments until after he filed his first charge of discrimination. Considering each alleged incident of a racial comment, however, none is "severe" in that it could not be reasonably viewed as changing the terms and conditions of plaintiff's employment. Title VII does not mandate an insult-free workplace and federal courts are not arbiters of speech, even the most offensive speech, in the workplace. Plaintiff points to no racially motivated manifestations by any fellow worker or supervisor, and to no incidents of subsequent conduct indicating any change in how plaintiff was treated. The court has considered the allegations of racial remarks within the totality of the circumstances presented in this case. Harris v. Forklift Sys., Inc., supra. Those circumstances include the undisputed facts that plaintiff was recently hired by the very same people he accuses of creating a hostile work environment; that when he threatened to quit, these very same people begged him to stay; that such people accommodated his request to not work in the cold; that when the third shift was eliminated, plaintiff was kept on even by the same persons, even though he was one of the last persons hired; that he was given a wage that was greater than white employees with more seniority; and, most importantly, plaintiff did not perceive any mistreatment, rather, he only inferred such from the hearsay statements from former coworkers. The totality of the circumstances point not to an employer who was trying to make work so inhospitable as to cause plaintiff to quit; rather, the circumstances show that plaintiff's employer at every turn attempted to

keep him happy in his work. In fact, plaintiff testified that Brandt even lied to him to keep him happy, in that Brandt was too embarrassed to admit to plaintiff that he did not have the authority to issue him a set of keys.

In determining whether there was a hostile or abusive work environment, the court looks to the totality of the circumstances. Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998). In making such a determination, the Supreme Court requires courts to consider

> the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

Harris v. Forklift Sys., Inc., supra, at 23. Indeed, plaintiff's own testimony is that he was never personally subjected to racially derogatory remarks at Food Lion, and that his productivity never decreased. Applying all of these factors, as discussed at greater length above, it is readily apparent that plaintiff was never personally subjected to racial slurs, and that racial bias, if any infected Store 2588, in no way interfered with the quality of his work, the environment of the workplace, or the circumstances of his employment.

The appellate court in Hartsell pointed out that the misconduct must render the workplace *objectively* hostile, not subjectively. The court has read every entry in plaintiff's personal journal and there is no doubt that plaintiff believes that every slight, criticism, or mistake of management is attributable to the alleged racial bias he discovered on February 22, 2004, when he went to the homes of former coworkers to solicit statements in support of his charge of discrimination. The court has searched plaintiff's evidence and, while finding that plaintiff subjectively believed he was treated differently due to race, the undersigned can find no objective evidence - - either circumstantial or direct - - that the alleged racist comments manifested themselves in the conditions of plaintiff's employment. Indeed, it

would appear that plaintiff was the hardest or next to the hardest worker Store 2588 had at the time and that management strived to accommodate his requests and keep him on the job.

While the alleged racial slurs reported by these former employees, taken as true, would reflect an archaic, insensitive, and crude attitude, there is no evidence that they affected any term or condition of plaintiff's employment. It appears that such comments had no objective impact on plaintiff's day-to-day employment. Plaintiff has not satisfied his burden of coming forward with evidence upon which a reasonable finder of fact could determine that his workplace was charged with race-based discrimination so as to make it objectively abusive. See Smith v. First Union Natl. Bank, 202 F.3d 234 (4th Cir. 2000). Title VII simply does not guarantee a workplace free from racial slurs, insensitive coworkers, and nescient supervisors. Plaintiff's Title VII hostile-work-environment claim, therefore, should be dismissed and the undersigned will so recommend.

Even if plaintiff had been able to satisfy the third element, he cannot satisfy the fourth element for a hostile work environment claim.

### 3. Plaintiff has not Satisfied the Fourth Element of a Hostile Work Environment Claim

The fourth element of a hostile work environment claim requires a showing that some basis exists for imputing liability to the employer. Assuming for the sake of argument that plaintiff had shown pervasive harassment at Store 2588, it appears that there is absolutely no basis for imputing liability to the defendant Food Lion.

No evidence has been presented that the defendant was ever informed of the alleged offensive conduct by plaintiff, that plaintiff ever availed himself of the three phone-in options, or that the company had received complaints from any other source (other than plaintiff's formal charges from the EEOC) concerning the work environment at Store 2588 or its predecessor. This lack of communication with the company is especially troubling

where, as here, plaintiff was a member of the defendant's management team and certified that he had received and read Food Lion's unequivocal policy against workplace discrimination. Plaintiff's Depo., Vol. I, Ex. 2. Plaintiff has not raised a genuine issue of material fact as to whether the defendant knew or should have known of the purported harassment.

A corporate employer may be held liable for a hostile environment claim when it had actual or constructive knowledge of the existence of the hostile work environment and took no prompt remedial action. Paroline v. Unisys Corp., 879 F.2d 100, 106 (4th Cir.1989). "[A]bsence of notice does not necessarily insulate that employer from liability." Meritor Sav. Bank v. Vinson, 477 U.S. 57, 72 (1986). There is no strict liability of corporate defendants in the hostile work environment arena; however, actual knowledge by a corporation is not required and a company may be found liable where it had "constructive knowledge."

A working definition of "constructive knowledge" is found in Ohio Farmers Indem. Co. v. Charleston Laundry Co., 183 F.2d 682 (4th Cir. 1950):

> The general rule of law respecting notice to or by an officer or agent of a corporation is that the rights of the corporation are not affected unless the notice is in regard to a matter coming within the sphere of the agent's duty while attending to the business of the corporation . . . .

Id., at 604. While an argument can be made that the alleged wrongful remarks were outside the sphere of any manager's duty, i.e., he wasn't hired to make offensive remarks, an argument also can be made that an aggrieved employee who places an offending supervisor on notice may impute notice to the corporation because receiving such notice was within the range of that supervisor's duty. There is no evidence that anyone confronted or reported any misconduct to any manager.

When EEOC charges were filed, plaintiff's own evidence is that an investigator was sent from Food Lion to determine whether the events alleged in the charge had taken place. There simply is no evidence that Food Lion failed to act, but instead it investigated each of

plaintiff's charges of discrimination and found them to be without merit. It is undisputed that plaintiff's counsel refused to allow such investigator to talk to plaintiff about the discrimination alleged in his first charge. Carrington Aff., at ¶ 6.

Absent constructive knowledge, a plaintiff must place into evidence facts upon which a reasonable trier of fact could determine that the corporate defendant had actual knowledge of the alleged occurrence of misconduct on the part of its employees. Even though he was a member of the management team, plaintiff admits that he never utilized the company's policy concerning complaints of racial harassment. Plaintiff does not allege lack of knowledge of the plan, futility, or fear of reprisals. He has not presented any evidence of actual knowledge.

Absent actual knowledge, plaintiff could argue that absence of notice to a corporate employer does not always insulate it from liability. The Supreme Court has entrusted to the lower courts the initial development of criteria as to when liability is imputed to the corporate defendant. Meritor Sav. Bank v. Vinson, supra. The Supreme Court held in Meritor that it was error for an appellate court to decide that "employers are always automatically liable for sexual harassment by their supervisors." Id., at 72. The Court also stated that, "[f]or the same reason, absence of notice to an employer does not necessarily insulate that employer from liability." Id. Plaintiff has not alleged any facts that would support a finder of fact imputing liability to the corporate defendant without either constructive or actual knowledge. There is no allegation or evidence that Food Lion knew or should have known of any propensity toward inappropriate conduct on behalf of any of its employees at Store 2588.

The fourth element of a hostile work environment claim has not been satisfied.

### b.    Racial Discrimination in Employment Claim

On a claim of racial discrimination in employment, a plaintiff may establish a case of

racial discrimination through direct evidence of discrimination or through the cumulative effect based on indirect evidence of the employer's motivation. <u>Lovelace v. Sherwin-Williams Co.</u>, 681 F.2d 230, 240 (4th Cir. 1982). Alternatively, a plaintiff may attempt to establish a *prima facie* case of race discrimination through use of a "<u>McDonnell-Douglas</u> scheme." <u>Id</u>. To make out a *prima facie* case, plaintiff would have to show that

(1)    he is a member of a protected class;

(2)    he was qualified for the job;

(3)    he was subjected to an adverse employment action; and

(4)    he was either replaced by or treated differently than persons outside the protected class.

<u>Id.</u>

If a plaintiff can establish such a *prima facie* case, the burden shifts to the employer to show some legitimate, nondiscriminatory reason for the employment action. <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 252-53 (1981). Upon such a showing, the burden shifts back to plaintiff, and the employee has the burden of proof to show by a preponderance of the evidence that the legitimate reasons offered by the employer were not true reasons, but were pretext. <u>Id</u>.

### 1. Plaintiff has Presumably Satisfied the First Two Elements

For the limited purposes of this motion, the court will assume that plaintiff has satisfied the first two elements as to his hostile work environment claim.

### 2. Plaintiff has not Satisfied His Burden as to the Third Element of Showing an Adverse Employment Action

In reviewing plaintiff's evidentiary proffer, what appears to be missing is any

evidence of an <u>adverse</u> employment action:

> An adverse employment action is a discriminatory act which adversely affects the terms, conditions, or benefits of the plaintiff's employment. Conduct short of ultimate employment decisions can constitute adverse employment action.

<u>James v. Booz-Allen & Hamilton, Inc.</u>, 368 F.3d 371, 375-76 (4th Cir. 2004)(internal citation, footnote, and quotation marks omitted). <u>See also</u> <u>Webster v. Rumsfeld</u>, 2005 WL 3229753, *6 (4th Cir. Dec. 1, 2005).[3] Plaintiff points to a myriad of issues which he contends are adverse employment actions. The undersigned will attempt to address each contention.

<u>Brandt's alleged promise to make him a "night manager."</u> The Court of Appeals for the Fourth Circuit in <u>James</u> did find that a decrease in job title was an adverse action. <u>James v. Booz-Allen & Hamilton, Inc.</u>, <u>supra</u>, at 376. There is, however, no evidence that plaintiff was ever given the job title of "night manager." Instead, plaintiff was at all relevant times was known as a "Person -In-Charge" and was considered by management as well as co-workers to be a member of management. The undisputed evidence is that Food Lion simply has no position known as "night manager," that plaintiff applied for and received the position of "stocker," and that based on Brandt's confidence in plaintiff, he was chosen to be a "Person-In-Charge." Thus, plaintiff never received a decrease in any benefit, including his job title and, in any event, a "Person-In-Charge" versus a "night manager" is a "distinction without a difference" inasmuch as plaintiff was at all time considered to be a managerial employee.

<u>Brandt's failure to provide plaintiff with a set of keys to the store.</u> Plaintiff has failed to show that receipt of keys to Store 2588 was any sort of job benefit as opposed to a burden avoided. Indeed, the undisputed evidence of record shows that there were only four sets of

---

[3] Due to the limits of electronic filing, unpublished decisions referred to herein are incorporated by reference to the Westlaw or Lexis citation.

keys allowed by Food Lion, and that a number of other managers - - all Caucasian - - also never got keys to the store. Plaintiff has failed to articulate how not receiving keys is <u>adverse</u> to him.

Plaintiff admitted in his deposition that the failure to provide him with keys was not racially motivated, but that Brandt had found out there was no such position as "night manager" and for that reason did not give him the keys. "That's the only reason." Plaintiff's Depo., Vol. II, at 69-70.

<u>Food Lion not providing a 90 day review</u>. Plaintiff contends that Food Lion's failure to provide him with a 90 day performance review and raise was an adverse action. As the Affidavit of Store Manager Brandt shows, the 90 day review did not enure to the benefit of any employee and was a mechanism to discipline or demote employees who were not meeting expectations. The 90 day review did not involve a raise for anyone. Further, the record is undisputed that plaintiff would have only been considered for an increase in pay at his one year review. Finally, defendant has shown that it did not perform the 90 day review as to other coworkers due to workload associated with opening and operating a new store. Inasmuch as plaintiff has failed to show that defendant's failure to provide a 90 day review was adverse, this contention does not satisfy the third element.

<u>Pegg's failure to make eye contact with plaintiff and otherwise being critical of his work</u>. Apparently, Pegg's criticism of plaintiff's work was limited to an isolated comment that he spent too much time cleaning the back room of the store. Plaintiff's Depo., Vol. I, at 173. Regardless of whether such criticism was accurate, ignoring, failure to make eye contact, and work-related criticism are not adverse employment <u>actions</u>. "[M]ere ostracism in the workplace is not enough to show an adverse employment decision." <u>Strother v. Southern California Permanente Medical Group</u>, 79 F.3d 859, 869 (9th Cir. 1996)(citation

omitted). "[C]o-worker ostracism may be uncomfortable and uncivil, but such behavior does not constitute an adverse employment action." Swann v. Roadway Express, Inc., 2004 WL 1166651, *9 (M.D.N.C. 2004). Plaintiff has not, therefore, shown that Pegg's conduct amounted to an adverse employment action.

Assignment of extra tasks and cutting hours. Plaintiff has presented no evidence that he was ever assigned duties inconsistent with his job as a stocker or his duties as a "Person-In-Charge." It is equally undisputed that plaintiff always finished the assigned tasks within his shift. Further, Pegg specifically requested that he inform her if the work was too much so that she could balance it out, which he never did.

> Plaintiff cites only two instances in which he was assigned more work than his co-workers, hardly a "pervasive" problem rising to the level of an adverse employment action.

Gbenoba v. Montgomery County Dept. of Health and Human Services, 2005 WL 1490008, (D.Md. 2005). The fact that an employee was given extra work during overtime assignments did not constitute "adverse employment action," and thus could not serve as basis for retaliation claim under Title VII. Johnson v. Aluminum Co. of America, 2005 WL 2810687 (M.D.N.C. 2005).[4]

As to the reduction in hours, it was plaintiff who complained that he was required to work too many hours, and defendant clearly accommodated this request by reducing his hours.

> [E]vidence that plaintiff herself sought reduced hours defeats her claim that reduction in her hours was unlawfully motivated by plaintiff's race or sex as well as the necessary showing that the reduction constituted an adverse employment action . . . .

Graham v. Big Lots Stores, Inc., 2005 WL 1662054, *2 (E.D.Mo. 2005).

---

[4]     Due to the limits of electronic filing, such unpublished decision is incorporated herein by reference to the Westlaw citation.

Plaintiff has not satisfied the third element which requires the showing of some adverse employment action.

### 3. Plaintiff Cannot Satisfy the Fourth Element of a Racial Discrimination Claim

To satisfy the fourth element of a racial discrimination in employment claim, plaintiff must show that he was either replaced by or treated differently than persons outside the protected class. Plaintiff cannot show he was replaced by anyone inasmuch as it is undisputed that plaintiff's sole reason for leaving was due to a physical inability to do the work. Food Lion still considers plaintiff to be an inactive employee. Thus, plaintiff must show that he was treated differently than similarly situated Caucasian employees.

Plaintiff has not shown that he was treated differently than persons outside the protected class. If anything, the evidence shows that plaintiff was treated as well if not better than similarly situated Caucasian employees not based on his race, but on the quality of his work and his reliability. For starters, plaintiff was hired at an hourly rate $1 higher than fellow Caucasian stockers. Further, with no stocking experience, his rate of pay was only 50 cents per hour less than a Caucasian stocker who had been on the job for 13 years. Further, he was chosen for a position of responsibility as a "Person-in-Charge" over a competing Caucasian employee, who had tenure at Food Lion. When plaintiff initially threatened to quit, Brandt persuaded him to stay, which is nearly opposite to what Brandt did when Gravley, a Caucasian employee and avowed racist, threatened to quit.

While plaintiff contends that he was made to work 14 days straight without a day off, it is undisputed that Bartolet was required to work 16 days without a day off. Brandt Aff., at ¶ 4  While plaintiff complains he was required to work a truck alone, so was Bartolet. In addition, defendant has shown that when it downsized its operation at Store 2588, it cut back and adjusted the job duties of all night shift employees irregardless of race. In fact, plaintiff

was kept on while other white employees were discharged.

While plaintiff points to a number of areas of supervision where he believes he was singled out, he has failed to show that other similarly situated Caucasian employees were not subjected to similar supervision.

Plaintiff's belief that he was subjected to different treatment finds no support in the evidence produced, leaving plaintiff's evidence to be little more than his own specualtion. Speculation and conjecture raise a mere possibility of discrimination rather than the reasonable probability which is necessary to support an inference of discrimination. Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241-42 (4th Cir. 1982). Speculative assertions that a defendant's or a person's motivation was unlawful is not enough to withstand summary judgment, Goldberg v. B. Green and Co., 836 F.2d 845, 848 (4th Cir. 1988); and conclusory statements will not satisfy plaintiff's burden in responding to the motion for summary judgment. Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp., 828 F.2d 211 (4th Cir. 1987). Unsupported allegations "do not confer talismanic immunity from Rule 56." Ross v. Communications Satellite Corp., 759 F.2d 355, at 365 (4th Cir. 1985). Plaintiff's allegations of discriminatory animus in his supervision are clearly speculative. A court cannot allow a jury to decide issues based on speculation. Fed.R.Evid. 401 & 602.

Finding that plaintiff cannot meet the third or fourth elements, the undersigned will recommend that defendant's Motion for Summary judgment be granted.

### 2.      Food Lions' Legitimate Business  Reasons for Any Action it Took.

Even if plaintiff had satisfied his burden as to his  Title VII claim of showing a prima facie case, the burden would then have shifted to defendant to articulate a legitimate, nondiscriminatory reason for their actions. In this case, defendant has clearly and unequivocally shown that any actions it took as to plaintiff's employment were based on his

own request, such as too many hours, or on legitimate business need, such as a reduction in operating hours at Store 2588. Defendant has satisfied its burden.

### 3. The Burden Shifts Back to Plaintiff to Show Pretext.

Where a defendant satisfies its burden, plaintiff must show by a preponderance of the evidence that defendants' legitimate, nondiscriminatory reason was a pretext for discrimination. That burden can be satisfied by showing that the reason defendant has put forward is a mere pretext for discrimination and that the plaintiff's race is the more likely reason for the termination. Herold v. Hajoca Corp., 864 F.2d 317, 319 (4th Cir. 1988), cert denied, 490 U.S. 1107 (1989).

> The question is not whether [defendant] exercised prudent business judgment, . . . but whether [plaintiff] has come forward to refute the articulated, legitimate reasons for his discharge. In this regard, [plaintiff] must do more than challenge the judgment of his superiors through his own self-interested assertions.

Dale v. Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir. 1986)(citations omitted), cert. denied, 479 U.S. 1066 (1987). Consistent with the Court of Appeals for the Seventh Circuit, the Fourth Circuit reasoned that what is relevant is not a plaintiff's belief that his employment was adversely impacted because of his race, but "the perception of the decision-maker." Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980). See Elliott v. Group Medical & Surgical Service, 714 F.2d 556 (5th Cir. 1983).

Plaintiff's argument that defendant decided to stop operating Store 2588 on a 24 hour basis to spite him is, to say the least, speculative. In this case, a presumption even arises in favor of defendant under Proud v. Stone, 945 F.2d 796 (4th Cir. 1981), to the effect that an adverse employment action is presumed not to be pretextual where the act is done by the same person who recently hired the plaintiff. That presumption appears applicable inasmuch as it was Brandt who hired plaintiff in close temporal proximity to the alleged wrongful acts.

In this case, plaintiff has offered nothing more than his own speculation, which neither rebuts the presumption in <u>Proud</u> nor defeats Food Lion's legitimate business reason.

### 4.    Conclusion

The undersigned has closely reviewed plaintiff's first and fourth causes of action and finds that no genuine issues of material fact remain and that defendant is entitled to the judgment it seeks on those claims as a matter of well settled law.  Inasmuch as plaintiff's Section 1981 claim, which is contained within his first cause of action, is subject to the same analytical framework as a Title VII claim, defendant is also entitled to summary judgment on the Section 1981 claim.

### B.    Second Cause of Action: Retaliation.

Plaintiff's second cause of action is for retaliation under Title VII.  Such a claim is not, however, dependent on the validity of the underlying claim, inasmuch as it is unlawful for an employer to retaliate against an employee for filing a charge of discrimination even where the employee asserts a what is later determined to be a baseless claim of discrimination.  Thus, the undersigned has treated this claim separately from the first and fourth causes of action.

A plaintiff may establish a case of retaliation for making charges of racial discrimination through use of a "McDonnell-Douglas scheme" as discussed above. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973); <u>McNairn v. Sullivan</u>, 929 F.2d 974, 980 (4th Cir. 1991).  To make out a *prima facie* case of retaliation, plaintiff would have to show the following:

(1)    he engaged in protected activity;

(2)    he was subjected to an adverse employment action; and

(3)    a causal relationship existed between the first two elements.

Id.  If a plaintiff establishes such a *prima facie* case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action.  Texas Dept. of Community Affairs v. Burdine, supra.  Upon such a showing by the employer, the burden would then shift back to the plaintiff to show by a preponderance of the evidence that the legitimate reasons offered by the employer were not true reasons, but were pretext for retaliation.  Id.  To make such a showing, the plaintiff must prove that "but for" the protected conduct, the adverse employment action would not have occurred.

Plaintiff filed two complaints with the EEOC, the first being on February 19, 2004, and the second some four months later.  Plaintiff has yet to return to work after the second charge, making the window of inquiry limited to February 19, 2004, through his departure in June 2004.  At this point the court leaves behind the allegations concerning keys and job titles which predate his first charge and focuses on the events or acts which plaintiff contends were in retaliation for his charges of discrimination:

(1)     excessive labor;

(2)      requiring plaintiff to account for tasks accomplished in writing;

(3)     singling plaintiff out by counting the cases he shelved;

(4)     locking the door to the front office;

(5)     denying his Worker's Compensation claim; and

(6)     being shunned by a co-worker.

Inasmuch as the "excessive labor" and "shunning" claims have been addressed above, the undersigned will incorporate those discussions herein by reference and find no basis for those claims.

As to the task lists, plaintiff has not shown that such requirement was outside his duties as a stocker or that the other stocker was not required to do the same thing.  Further,

plaintiff has not shown why such an accounting is unreasonable supervision or punitive. Other employees received lists of tasks to perform and the plaintiff was treated the same as those other employees. Brandt Aff., at ¶ 9.

As to case counts, defendant has shown that it tracks the number of cases stocked per hour of all its stockers. Plaintiff admitted that it was only on one occasion that anyone counted the number of cases he stocked, and not only is such supervision not adverse, it is not substantial.

As to the locking of the office door, plaintiff only speculates that this was in retaliation for filing a claim of discrimination. Simply taking reasonable security measures does not give rise to an inference of retaliation.

As to denying or challenging his Worker's Compensation claim concerning his shoulder pain, plaintiff noted in his personal journal that "I told Jeff that it did not happen on the job and that it was an ongoing problem." Plaintiff's Depo., Vol. I, Ex. 20. To claim that defendant's resistance to paying such a claim, when it knew the claim to be without merit, was in retaliation for filing a charge of discrimination is not only speculative, but unsupported by any evidence. Food Lion has an obligation to its workers compensation insurance carrier as well as the Industrial Commission to contest claims if it knows an employee has submitted a claim for an injury that it has reason to believe did not occur on the job.

Even if plaintiff had established some adverse employment action in retaliation for filing his charges, plaintiff has failed to show a nexus between the purported adverse action and the charges. Instead, Food Lion has shown legitimate, non-retaliatory reasons for every employment action it took as to plaintiff, and all such actions were either as an accommodation to plaintiff or based on business necessity.

Finding that plaintiff has failed to show any adverse action or establish a causal connection between the first two elements, the court will recommend summary judgment as to such claim, inasmuch as plaintiff has not established a *prima facie* case.

Alternatively, if plaintiff could have established a *prima facie* case, the court finds that summary judgment should be entered against him, inasmuch as defendant has articulated a legitimate, nondiscriminatory reason for all actions it took, to which plaintiff has not shown pretext.

### C.     Third Cause of Action: Disparate Treatment and Disparate Impact.

To survive summary judgment on this claim, plaintiff must present evidence that a facially neutral employment practice or policy falls more harshly on one group of individuals than another and cannot be justified by business necessity.  Chapman v.  Lorillard tobacco Co., 342 F.Supp.  2d 383, 395 (M.D.N.C. 2004).  The undersigned allowed plaintiff wide-ranging discovery at other stores in the Asheville Division, but plaintiff has presented absolutely no evidence of any employment policy or practice that has fallen more harshly and disproportionately on one class of individuals.  Plaintiff has not shown with competent evidence that any class of persons is  under represented as employees at any level of Food Lion employment or that any criteria used by Food Lion had a significant impact on any class of individuals.  Plaintiff merely speculates that African-Americans are under represented in management at Food Lion, but has produced no statistical data backing up his speculation.  Summary judgment will be recommended on this claim.

### D.     Fifth Cause of Action: "Wrongful Discipline."

This claim appears to be asserted under Section 1981, and as such, plaintiff appears to contend that he was wrongfully required to work the trucks alone because he is an African-American.  As discussed above, Section 1981 and Title VII are governed by the same

analytical framework and this claim presents nothing more than an amalgamation of his first and second causes of action. The evidence of record is also antithetical to this claim inasmuch as it shows that the other stocker, who is Caucasian, worked trucks alone. For those reasons, summary judgment should be granted as to the fifth cause of action.

   E.   **Sixth Cause of Action: "Racial Discrimination."[5]**

Plaintiff's sixth cause of action for racial discrimination in violation of the North Carolina Equal Employment Protection Act fails on its merits for the reasons discussed above as to plaintiff's constructive discharge/hostile work environment claim and wrongful discipline claim. The claim fails procedurally because such a claim simply does not exist.

It is the express public policy of the State of North Carolina to protect the right of all people to seek, obtain, and hold employment without discrimination. N.C.Gen.Stat. § 143-422.2, N.C. Gen. Stat. Plaintiff contends that his alleged constructive discharge constitutes a violation of that public policy and that North Carolina law provides him with a private cause of action. The Court of Appeals for the Fourth Circuit, in a published decision originating in this district, held, in pertinent part, as follows:

> Neither the North Carolina Supreme Court nor the North Carolina Court of Appeals has recognized a private cause of action under the NCEEPA. Instead, most courts have applied the NCEEPA only to common law wrongful discharge claims or in connection with other specific remedies.
> In *Mullis v. Mechanics & Farmers Bank*, 994 F.Supp. 680 (M.D.N.C. 1997), the court held that "[a]bsent a clear indication from the courts or the legislature of North Carolina that a private right of action does exist under the NCEEPA, it would be inappropriate for a federal court to create a private right of action under the NCEEPA, and this court declines to do so." We agree.

Smith v. First Union National Bank, 202 F.3d 234, 247 (4th Cir. 2000) (citations and footnote omitted). In conformity with that decision, the undersigned will recommend summary

---

[5]   Plaintiff has placed claims six through eight under the heading of "Pendant [*sic*] Claims," which the court interprets to be "supplemental claims." 28 U.S.C. §1367.

judgment on this claim.

**F.     Seventh Cause of Action: Negligence**

Simple negligence is not actionable between an employer and employee in North Carolina, even when it concerns alleged negligent supervision in a workplace supposedly fraught with racial abuse and harassment.  <u>Loftis v.  Brown & Williamson Tobacco Corp.</u>, 1996 U.S. Dist.  LEXIS 8255 (M.D.N.C. 1996).  Workplace negligence is within the exclusive province of the North Carolina Industrial Commission, and the undersigned will recommend that a dismissal without prejudice be entered on this claim inasmuch as it is outside the jurisdiction of this court.

**G.     Eighth Cause of Action: Intentional Infliction of Emotional Distress**

The elements of intentional infliction of emotional distress  are "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress."  <u>Hogan v. Forsyth Country Club</u>, 79 N.C. App. 483, 488, <u>disc. rev. denied</u>, 317 N.C. 334 (1986).  "It is a question of law for the court to determine, from the materials before it, whether the conduct complained of may reasonably be found to be sufficiently outrageous as to permit recovery."  <u>Id</u>., at 490.  In this case, plaintiff cannot prove his claims of harassment, racial discrimination in employment, or retaliation; indeed, plaintiff cannot show that defendant in any way condoned wrongful conduct to which he was allegedly subject.  Counterposed to the standard of "extreme and outrageous conduct" by a corporate defendant, the policies and investigatory procedures employed by defendant in this matter appear to be exactly what Title VII and the courts have been striving for: effective mechanisms for discouraging discrimination in places of employment.

Further, plaintiff has not proffered evidence of acts which "exceed all bounds of decency," <u>West v. King's Dep't Store, Inc.</u>, 365 S.E.2d 621, 625 (N.C. 1988); or which could

be "'regarded as atrocious, and utterly intolerable in a civilized community,'" Wagoner v. Elkin City School Bd. of Educ., 440 S.E.2d 119, 123 (N.C. Ct. App. 1994) (citation omitted). North Carolina courts will call to task (1) those who engage in primitive and uncivilized behavior in an attempt to impose their prurient will on others or (2) those in positions of authority and responsibility (such as corporate defendants) who allow such conduct to occur or continue. Id. Summary judgment, therefore, should be granted on plaintiff's common-law claim for intentional infliction of emotional distress.

## RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that plaintiff's Motion for Hearing be **DENIED,** defendant's Motion for Summary Judgment be **ALLOWED** in its entirety, that the claim for negligence be dismissed without prejudice for lack of subject-matter jurisdiction, and that all remaining claims be dismissed with prejudice.

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir.), cert. denied, 467 U.S. 1208 (1984).

**Signed: January 5, 2006**

_Dennis L. Howell_
Dennis L. Howell
United States Magistrate Judge