**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**

**CIVIL NO.  1:04CV278**

| | |
|---|---|
| **MARK DAUGHERTY**, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **MEMORANDUM** |
| ) | **AND ORDER** |
| **FOOD LION, LLC,** ) | |
| ) | |
| **Defendant.** ) | |
| ——————————————— ) | |

**THIS MATTER** is before the Court on Plaintiff's timely filed objections
to the Memorandum and Recommendation of Magistrate Judge Dennis
Howell and Defendant's response thereto.  For the reasons stated herein,
the Court adopts the Memorandum and Recommendation.

## I. STATEMENT OF FACTS

Plaintiff Mark Daugherty is an African-American male who claims that
he was discriminated against in his employment at a Food Lion store in
Brevard, North Carolina, based on his race.  Prior to becoming an
employee of the Defendant Food Lion, the majority of Plaintiff's work

experience was in floor cleaning.  **Deposition of Mark A. Daugherty,**

**dated August 23, 2005, Vol. 1, at 16.**  Plaintiff cleaned floors at various

Food Lion grocery stores throughout North Carolina and other states for

"[p]robably about 12, 15" years.  *Id.*  Plaintiff became acquainted with

Jeffrey Brandt and Richard Redmon, both of whom would later become his

superiors at the Brevard Food Lion store,[1] through his floor cleaning

experience.  *Id.***, at 18-19; Exhibit 12,** *attached to* **Daugherty Deposition.**

In fact, they knew each other well enough for Plaintiff to ask these

individuals to write letters of recommendation for him.  **Daugherty**

**Deposition, at 104-05; Exhibit 12,** *supra.*  In his recommendation, Brandt

remarked that he had known Plaintiff for five years, that he was "a very

pleasant person to be around, courteous and works hard at any task

given," and that he "will be an asset to any organization."  *Id.*  Similarly,

Redmon wrote that he had known Plaintiff for five years, that he "has

always been very pleasant and worked hard at whatever asked of him,"

and that he "will add value to any organization."  *Id.*  Plaintiff also knew

---

[1] Jeff Brandt was the store manager, while Rich Redmond was the grocery manager at the Brevard Food Lion.  **Daugherty Deposition, Vol. 1, at 61.**

many of his other future Food Lion colleagues, including Kim Pegg,[2] prior to becoming a Food Lion employee. **Daugherty Deposition, Vol. 1, at 25.**

When Plaintiff was seeking work in the fall of 2003, he made the decision to apply for a job at the Brevard Food Lion. He completed his application for employment in October 2003, applying for a position as a "stocker" and listing Rich Redmon, Jeff Brandt, and Richard Bartlett as "friends" working at Food Lion. **Exhibit 2, *attached to* Daugherty Deposition.** Plaintiff was hired in the capacity of "stocker" on or about November 2, 2003. **Daugherty Deposition, Vol. 1, at 23.** Plaintiff, who had no prior grocery store experience, was hired at a rate of $9.50 per hour. This wage was 50 cents less per hour than stocker Richard Bartlett, who had more than ten years seniority at Food Lion, and was one dollar more than other (white) employees with a similar lack of grocery store work experience. ***Id*., at 31, 32, 175-76; Affidavit of Jeffrey Brandt, filed September 30, 2005, ¶ 5; Deposition of Jason Gravley, dated September 18, 2005, at 16.** Upon his hiring, Food Lion provided Plaintiff with an Associate Handbook. ***See,* Exhibit 4, *attached to* Daugherty**

---

[2] Kim Pegg was the assistant manager at the Brevard Food Lion. **Daugherty Deposition, Vol. 1, at 61.**

**Deposition.**  Plaintiff's Handbook contained information concerning

multiple ways to report perceived harassment and included at least two

different telephone numbers to call and make such a report.  **Id., at 17.**

Plaintiff spent his first three days of work at the "old" Brevard store

(Store #291).  Plaintiff then moved to the "new" Brevard Food Lion (Store

#2588), at which he had been hired, in order to prepare for its grand

opening.  While helping ready Store #2588 for its grand opening, Plaintiff

asserts that store manager Jeff Brandt told him that he would be the "night

manager" of Store #2588.  **Daugherty Deposition, Vol. 1, at 40-42.**  The

"new" store opened on or about December 3, 2003.  **Id., Vol. 1, at 44.**

Plaintiff avers that he was subjected to racially-motivated

discrimination essentially from the beginning of his employment at Store

#2588.  According to Plaintiff's statement to the Equal Employment

Opportunity Commission ("EEOC"), such discrimination included: Kim

Pegg ignoring Plaintiff and refusing to make eye contact with him; he was

required to work 14 straight days when Store #2588 had its grand opening;

Plaintiff was scheduled for more than 40 hours per week in December in

an "attempt to wear [him] down with excessive hours;" Plaintiff was

scheduled for less than 40 hours per week in January "after the grand

opening and holiday rush" while another stocker (an employee with more than a decade of seniority and experience at Food Lion) was still scheduled for 40 hours per week; he was required to stock frozen foods; his job performance was criticized by assistant manager Pegg; and he was not given a set of keys to Store #2588.  **Exhibit 15,** ***attached to*** **Daugherty Deposition.**

On February 19, 2004, Plaintiff filed his first charge of discrimination with the EEOC, asserting that he was the victim of racial discrimination at Food Lion.  ***Id.***  After investigating his allegations, the EEOC informed Plaintiff that it "was unable to conclude that the information obtained establishes violations of the statutes," and informed Plaintiff of his right to sue.  **Exhibit B,** ***attached to*** **Plaintiff's First Amended Verified Complaint, filed March 22, 2005.**  Food Lion also conducted its own investigation into Plaintiff's claim of racial discrimination and found Plaintiff's claim "unsubstantiated."  ***See,*** **Affidavit of Cheryl Carrington, filed September 30, 2005, ¶¶ 4-6.**

Sometime around the end of February or the beginning of March 2004, Plaintiff took medical leave from Food Lion, returning to work on or about April 19, 2004.  ***See,*** **Plaintiff's First Amended Verified Complaint,**

**at 43 (alleging February 28 as the day Plaintiff went on medical leave);
Daugherty Deposition, Vol. 1, at 78 (testified that March 3 was the day
he went on medical leave); at 80 (testified he returned to work on or
about April 19).** Plaintiff asserts that after returning from his medical
leave, he was subjected to retaliation for having filed the February 2004
EEOC complaint. According to Plaintiff, such retaliation included: being
"forced to do extreme labor" as the only person to unload delivery trucks; a
manager counting the number of cases Plaintiff stocked on one occasion;
Plaintiff being given a list of tasks to complete during his work shift; denial
of his workers' compensation claim by Food Lion; and Food Lion
intentionally inflicting injury on Plaintiff. **Exhibit 22, *attached to
Daugherty Deposition; Plaintiff's First Amended Verified Complaint;
Plaintiff's Objections to Memorandum and Recommendation of
Magistrate, filed January 19, 2006.**

Defendant learned in early June 2004 that Plaintiff believed he had
been retaliated against for filing his February EEOC charge. **Carrington
Affidavit, ¶ 7.** As with Plaintiff's February discrimination claims, Defendant
undertook an investigation of Plaintiff's allegations. ***Id.*, ¶ 8.** After

conducting its investigation, Defendant found Plaintiff's retaliation claim to be "unsubstantiated." *Id.*

On July 7, 2004, Plaintiff filed a second charge of discrimination with the EEOC on the basis of retaliation by Food Lion. **Exhibit 22,** *supra***.** The EEOC was "unable to conclude that the information obtained establishes violations of the statutes," and Plaintiff was informed of his right to sue on September 29, 2004. **Exhibit A,** *attached to* **Plaintiff's First Amended Verified Complaint.** Plaintiff subsequently filed this action alleging:

(1) Racial discrimination under Title VII and 42 U.S.C. § 1981;

(2) Retaliation under Title VII for exercising his rights under Title VII;

(3) Disparate treatment and disparate impact under Title VII;

(4) Constructive discharge under Title VII;

(5) "Wrongful discipline" under 42 U.S.C. § 1981;

(6) Racial discrimination in violation of the North Carolina Equal
 Employment Practices Act ("NCEEPA");

(7) Negligent supervision; and

(8) Intentional infliction of emotional distress.

*See*, **Complaint; Memorandum and Recommendation, at 2.**  The case was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), who recommended Defendant's motion for summary judgment be granted. *Id.*, **at 32.**  Plaintiff timely filed objections to the Memorandum and Recommendation, Defendant has filed its response thereto, and the matter is now ripe for disposition.  *See*, **Plaintiff's Objections; Food Lion's Response to Plaintiff's Objections to Memorandum and Recommendation, filed January 30, 2006.**

## II. STANDARD

### A. Objections to Memorandum and Recommendation

A party may file written objections to a magistrate judge's memorandum and recommendation within ten days after being served with a copy thereof.  **28 U.S.C. § 636(b)(1).**  "Any written objections must *specifically identify* the portions of the Report and Recommendation to which objections are made *and* the basis for such objections."  ***Thomas v. Westinghouse Savannah River Co.*, 21 F.Supp.2d 551, 560 (D.S.C. 1997); *see also*, *Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987) ("Parties filing objections must specifically identify**

**those findings objected to.").** "Frivolous, conclusive or general

objections need not be considered by the district court." ***Battle*, 834 F.2d**

**at 421.**

> A general objection, or one that merely restates the arguments
> previously presented is not sufficient to alert the court to
> alleged errors on the part of the magistrate judge. An
> "objection" that does nothing more than state a disagreement
> with a magistrate's suggested resolution, or simply summarizes
> what has been presented before, is not an "objection" as that
> term is used in this context.
>
>        *          *          *
>
> A general objection to the magistrate's report has the same
> effect as a failure to object. The district court's attention is not
> focused on any specific issues for review, thereby making the
> initial reference to the magistrate useless. The functions of the
> district court are effectively duplicated as both the magistrate
> and the district court perform identical tasks. The duplication of
> time and effort wastes judicial resources rather than saving
> them, and runs contrary to the purposes of the Magistrates Act.

*Aldrich v. Bock*, 327 F.Supp.2d 743, 747-48 (E.D. Mich. 2004); *see also,*

*Betancourt v. Ace Ins. Co. of Puerto Rico,* 313 F.Supp.2d 32, 34

**(D.P.R. 2004) ("[Plaintiff's] objections do not reflect an understanding**

**that a plaintiff may not simply restate the arguments that the**

**Magistrate-Judge considered and expect the Court to treat the filing**

**seriously.").** General or conclusive objections result not only in the loss of

*de novo* review by the district court but also, as with a failure to object,

waiver of appellate review. ***Tyler v. Beinor***, 81 Fed. Appx. 445, 446 (4th Cir. 2003); ***United States v. Woods***, 64 Fed. Appx. 398, 399 (4th Cir. 2003). If proper objections are made, a district court will review the objections under a *de novo* standard. **28 U.S.C. § 636(b)(1).** Where no objection is made, the court need "'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" ***Diamond v. Colonial Life & Accident Ins. Co.***, 416 F.3d 310, 315 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72, Advisory Committee note).

## B. Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." **Fed. R. Civ. P. 56(c).** "Summary judgment is proper 'unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'" ***Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.***, 407 F.3d 631, 635 (4th

**Cir.),** *cert. denied,* **126 S. Ct. 568 (2005) (quoting** *Anderson v. Liberty Lobby, Inc.,* **477 U.S. 242, 249 (1986)).** A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of the . . . pleading[s], but [must] . . ., by affidavits or as otherwise provided in [Rule 56], . . . set forth specific facts showing that there is a genuine issue for trial." **Fed. R. Civ. P. 56(e).**

A verified complaint, such as that filed in this case, is treated as an affidavit for purposes of summary judgment. *See, e.g., Walker v. Tyler County Comm'n,* **11 Fed. Appx. 270, 274 (4ᵗʰ Cir. 2001).** However, as with an affidavit, the statements made therein must be based on first-hand knowledge. *Id.* Inadmissible hearsay, speculation, innuendo, and legal conclusions, whether "cast in the form of factual allegations" or not, do not take on the protective cloak of "fact" for purposes of summary judgment merely because the complaint has been signed under oath. *See, Causey v. Balog,* **162 F.3d 795, 803 n.4 (4ᵗʰ Cir. 1998) ("Rule 56(e) precludes consideration of materials not based on the affiant's first hand knowledge.");** *Williams v. Griffin,* **952 F.2d 820, 823 (4ᵗʰ Cir. 1991) (same);** *Farm Credit Servs. of Am. v. Am. State Bank,* **339 F.3d 764, 769 (8ᵗʰ Cir. 2003) (legal conclusions are not treated as fact merely**

**because plaintiff casts them in such a form).**  Furthermore, "a verified complaint that alleges facts that are made on belief or information and belief is insufficient to oppose summary judgment."  ***Walker, supra.***  Where the Court can differentiate between those alleged facts claimed to be based on personal knowledge and those claimed to be based upon information or information and belief, it will divide the facts into their respective categories giving each category its corresponding treatment; where this is not possible, however, the entire verified complaint loses its right to treatment as an affidavit.  ***Id.* (disregarding the entirety of the verified complaint for purposes of summary judgment where the court was unable to differentiate between facts that were and were not based on personal knowledge).**

Finally, in resisting a motion for summary judgment, a plaintiff may not create an issue of material fact merely by submitting an affidavit contradicting his own prior sworn testimony.

> "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."  A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.

**Rohrbough v. Wyeth Labs., Inc.**, 916 F.2d 970, 975 (4th Cir. 1990)

(quoting **Barwick v. Celotex Corp.**, 736 F.2d 946, 960 (4th Cir. 1984))

(internal quotations omitted); **see also**, **Alba v. Merrill Lynch & Co.**,

2006 U.S. App. LEXIS 13176, at *32-33 (4th Cir. 2006); **Waterhouse v.**

**R.J. Reynolds Tobacco Co.**, 162 Fed. Appx. 231, 235 (4th Cir. 2006).


## III. ANALYSIS

As an initial matter, Plaintiff offers no objection to the Magistrate

Judge's recommended disposition of his claims for disparate treatment and

impact in violation of Title VII (claim #3), negligent supervision (claim #7),

or intentional infliction of emotional distress (claim #8).  **See, Plaintiff's**

**Objections; Memorandum and Recommendation, at 29, 31-32.**  Absent

objection by the Plaintiff, and finding no clear error, the Court will adopt the

Magistrate Judge's recommendations regarding these three claims.  **See,**

**Diamond, supra**.

Plaintiff does offer objections to the Magistrate Judge's

recommended disposition of his other claims and to what he perceives as

"the Magistrate['s] fail[ure] to abide by the rules of Summary Judgment and

view the facts in the light most favorable to Plaintiff, the non-moving party."[3]

**Plaintiff's Objections, at 5.**

## A. Racial Discrimination and Constructive Discharge

The Magistrate Judge considered Plaintiff's first and fourth claims for relief together and found, after review of the pleadings, that both appeared to be based on a claim of a hostile work environment and capable of proof by the familiar *McDonnell-Douglas* burden shifting analysis.[4]  ***See,*** **Memorandum and Recommendation, at 11-12.**  After careful analysis, the Magistrate Judge found that Plaintiff failed to carry his burden as to a

---

[3] Due to Plaintiff's extensive factual objections, the Court has elected, in its discretion, to simply state the facts anew after a thorough review of the record rather than take each of Plaintiff's objections one at a time. While many of the factual findings challenged were immaterial to the determination of any claim, those that are material have been addressed by the Court in conjunction with the particular claim to which the factual objection relates.

[4] Under the McDonnell-Douglas analysis, a plaintiff has the initial burden of establishing each element of the *prima facie* case.  If the plaintiff carries his burden, the burden then shifts to the defendant to establish the existence of legitimate, non-discriminatory reasons for the challenged acts. If defendant is successful, the burden returns to the plaintiff to establish that the reasons proffered by the defendant are merely pretext.  ***See, e.g., Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, ___, 2006 WL 1098803, at *8 (4th Cir. 2006).**

claim of a hostile work environment or racial discrimination. Plaintiff objects to both findings.

### 1. Hostile Work Environment

A *prima facie* case for a claim based on a hostile work environment requires Plaintiff to "show that the harassment was (1) unwelcome, (2) based on race, (3) sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive atmosphere, and (4) that there is some basis for imposing liability on the employer." **Combs-Burge v. Rumsfeld, 2006 WL 694381, at *4 (4th Cir. 2006) (citing Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998).** The Magistrate Judge determined that Plaintiff failed to satisfy the third and fourth elements of a hostile work environment claim. Plaintiff objects to this recommendation, contending for various reasons that he has satisfied both elements. **Plaintiff's Objections, at 6-7.**

In determining whether the purported harassment was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere," "a court must look at all of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether

it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." ***Jennings v. Univ. of North Carolina, at Chapel Hill*, 444 F.3d 255, 269 (4ᵗʰ Cir. 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).** "The harassment must be both objectively and subjectively severe or pervasive." ***Combs-Burge*, *supra* (citing *Harris*, 510 U.S. at 21).** Whether the harassment is objectively severe or pervasive is judged from the perspective of a reasonable person in the plaintiff's position. ***Id.* (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).**

In this case, there is no question that Plaintiff subjectively believes he was the subject of severe and/or pervasive harassment based on his race. His "personal journal" is replete with examples of his belief that every action or inaction at Food Lion was directed at him and based on his race. ***See*, Exhibit 1, *attached to* Affidavit of Mark Daugherty, *attached to* Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, filed November 10, 2005.** The Magistrate Judge found, however, that Plaintiff failed to establish that the harassment was *objectively* severe or pervasive, and therefore, Plaintiff failed to establish

the third element of his *prima facie* case.  **See, Memorandum and**

**Recommendation, at 12-16.**

Plaintiff's dispute with this finding centers around the alleged use of

the racial epithet "nigger" in various forms at the Brevard Food Lion store.

*See*, **Plaintiff's Objections, at 6.**  As the Magistrate Judge stated, "the

use of the term 'nigger' is never acceptable and is a term that any

reasonable, civil person would find objectionable and offensive."

**Memorandum and Recommendation, at 13.**

> Far more than a "mere offensive utterance," the word "nigger"
> is pure anathema to African-Americans.  Perhaps no single act
> can more quickly alter the conditions of employment and create
> an abusive working environment than the use of an
> unambiguously racial epithet such as "nigger" by a supervisor
> in the presence of his subordinates.

*Spriggs v. Diamond Auto Glass*, **242 F.3d 179, 185 (4th Cir. 2001)**

**(citations and corresponding quotation marks omitted).**  In *Spriggs*,

however, the plaintiff was personally "exposed on a 'continuous daily' basis

to . . . racist comments concerning African Americans" for more than two

years.  *Id.,* **at 181-82, 184.**  The plaintiff in *Spriggs* related his experience

as follows:

> At his deposition, Spriggs testified that he left Diamond the first
> time because of Stickell's incessant racial slurs, insults, and
> epithets.  Indeed, Stickell rarely hesitated to vilify anyone of

African descent, including Diamond employees (whom he
proclaimed "niggers" or "monkeys") and customers of the
business.  Not even Stickell's wife, an African-American, was
off-limits, as Stickell repeatedly referred to her as a "black
bitch" in Sprigg's presence.  Stickell often became enraged
during telephone conversations with his wife, causing him to "fly
into a barrage of racial obscenities towards her and slam the
phone down.  She would call back.  Once again, she was a no-
good nasty bitch.  It was continuous daily."

*Id.*  Spriggs was eventually persuaded to return to his position of

employment at Diamond, only to be subjected to even worse harassment

now aimed more directly at him.  This harassment included such vile acts

as "Stickell plac[ing] a picture of a monkey between the pages of a parts

manual . . . that Spriggs regularly used . . . [on which Stickell included] the

notation 'so you'll never forget who you are.'" *Id.*

In contrast to the severe, pervasive conduct detailed in part above,

deposition testimony in this case reveals the following: (1) while Plaintiff

was informed by two or three fellow employees that they had heard others

at Food Lion use the epithet "nigger" at the Brevard store, Plaintiff never

personally heard the term used, **Daugherty Deposition, Vol. 1, at 125;**

**Deposition of Joshua Ryall, dated September 18, 2005, at 52-54 (Ryall**

**informed Plaintiff that he had heard racially derogatory remarks)**; (2)

Plaintiff never heard *any* racially derogatory comment while at work,

**Daugherty Deposition, Vol. 1, at 125**; (3) when asked to identify *anything*

that Rich Redmon had done to him or even in front of him that Plaintiff

contended was discriminatory, Plaintiff could cite nothing, *id.***, Vol. 1, at**

**147**; (4) similarly, Plaintiff could identify nothing that Kim Pegg did to him

other than ignore and not make eye contact with him, and the evidence is

clear that Pegg had similar interpersonal problems with other (white)

employees, *id.***, Vol. 1, at 146-47**; and (5) Plaintiff testified that he never

saw Kim Pegg or Rich Redmon treat *anyone* poorly or wrongly on the job,

and avers that he only saw Jeff Brandt do so by being "evasive" when

people would ask him about various things. *Id.***, Vol. 2, at 58.**

Despite these facts, Plaintiff alleges a hostile work environment

nevertheless existed and argues the Magistrate Judge erred in holding

"that comments not directly heard by the Plaintiff are not sufficiently

offensive to be considered harassment," citing to *Schwapp v. Town of*

*Avon*, 118 F.3d 106, 111 (2d Cir. 1997). **Plaintiff's Objections, at 6**

**(providing no citation to any such holding).** The Magistrate Judge

made no such holding. Instead, he correctly considered Plaintiff's second-

hand knowledge regarding the purported use of racial epithets "within the

totality of the circumstances" presented. **Memorandum and**

**Recommendation, at 14;** *Jennings*, **444 F.3d at 269 ("Under Title VII, a court must look at all of the circumstances[.]");** *Schwapp*, **118 F.3d at 110 (same).**

Without a doubt, use of the vile racial slur "nigger" in any form by anyone at Food Lion was inappropriate, offensive behavior. However, given the totality of the circumstances in this case, the facts do not reveal harassment that was sufficiently *objectively* severe or pervasive so as to alter the conditions of Plaintiff's employment and create an abusive atmosphere. Simply put, "Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace." *Hopkins v. Baltimore Gas & Elec. Co.*, **77 F.3d 745, 754 (4ᵗʰ Cir. 1996);** *see also*, *Jennings*, *supra* **("Title VII is not intended to serve as a workplace civility code, is not designed to purge the workplace of vulgarity, and does not countenance a federal cause of action for unpleasantness.");** *Lyle v. County of Fairfax Va.*, **2006 U.S. App. LEXIS 6025, at \*26 n.6 (4ᵗʰ Cir. 2006) (stating that even if plaintiffs had properly preserved a claim for hostile work environment based on a supervisor's offensive remarks regarding their race and sex, it would be rejected on the merits as "the isolated and infrequent conduct**

**complained of by plaintiffs, although arguably offensive, is more akin to the kind of rude and insensitive behavior that we have held is not sufficiently severe or pervasive to constitute a hostile work environment”);** *Belton v. City of Charlotte*, **2006 WL 1444394, at \*12-14 (4th Cir. 2006).**  Therefore, the Court finds that Plaintiff has failed to establish the third element of his *prima facie* case in regards to his first and fourth claims for relief to the extent they are based on a hostile work environment and summary judgment in favor of Defendant is appropriate.

The Magistrate Judge also found that Plaintiff had failed to establish the fourth element of a *prima facie* case of a hostile work environment that requires him to establish that there is some basis for imputing liability to the employer.  **See,** *Combs-Burge, supra*.  Plaintiff asserts that he suffered harassment at the hands of his supervisors, especially assistant manager Kim Pegg.  **See, Plaintiff's First Amended Verified Complaint; Plaintiff's Objections.**  "[I]n a case of harassment by a supervisor 'with immediate (or successively higher) authority over the employee,' an employer is vicariously liable for the harassment, subject to limited affirmative defenses[.]"  ***Howard v. Winter*, 446 F.3d 559, ___, 2006 WL**

**1172329, at \*4 (4th Cir. 2006) (quoting *Burlington Indus., Inc. v. Ellerth*,**

**524 U.S. 742, 765 (1998)).**

> When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, *see* Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (1) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an anti[-]harassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Burlington Indus.*, **524 U.S. at 765.** Defendant asserts that even if there

was conduct giving rise to a claim of hostile work environment, "Food Lion

cannot be held liable for any alleged discrimination because no tangible

employment action was taken against Plaintiff and Food Lion took prompt

and appropriate action immediately upon learning of Plaintiff's claims."

**Defendant's Reply to Plaintiff's Opposition to Motion for Summary Judgment ("Defendant's Reply"), filed November 28, 2005, at 15 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998), and *Burlington Indus.*, *supra*).** The Court agrees.

The record evidence in this case is clear that (1) there was no tangible employment action taken against Plaintiff, (2) Defendant had "well-established and strict policies against discrimination and harassment that are contained in, among other things, the Food Lion Associate Handbook that Plaintiff received at the time he was hired[,]" and (3) Plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by" Food Lion. **Defendant's Reply, *supra*; Burlington Indus., *supra*.**

First, Plaintiff was provided a Food Lion Associate Handbook when he was hired, which he has acknowledged receiving. ***See,* Daugherty Deposition, Vol. 1, at 33 and Exhibit 4.** This Handbook contains, among other things, Food Lion's policy prohibiting harassment "on the basis of a person's race," which Food Lion describes as being "strictly prohibited under the Equal Employment Opportunity policy and will not be tolerated." **Exhibit 4, at 16.**

> Conduct prohibited by this policy includes any verbal or physical conduct that may reasonably be perceived as derogatory or showing hostility toward an individual because of the individual's race . . . .  Harassment prohibited by this policy includes, but is not limited to:
>> 1. Epithets, slurs, negative stereotyping, or intimidating acts based on an individual's protected status[.]

*Id.*  The Handbook further explains in detail that any employee who feels that he has been harassed or discriminated against should report the conduct promptly, and that anyone who does so "is protected from any form of retaliation."  *Id.*, at 17.  Finally, the Handbook provides *four* different ways for an employee to report harassment, including two different telephone numbers, one of which is operated "7 days a week / 24 hours a day."  *Id.*  Defendant's clear anti-discrimination/harassment policy is "compelling proof" that Food Lion exercised reasonable care to prevent and correct harassment, and there is no evidence that such policy was a sham or unenforced by Food Lion.  ***See, Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 268 (4th Cir. 2001) ("Our cases have held that dissemination of 'an effective anti-harassment policy provides compelling proof' that an employer has exercised reasonable care to prevent and correct . . . harassment." (citation omitted)); Carrington**

**Affidavit (explaining Defendant's prompt investigation of both
Plaintiff's discrimination and retaliation allegations).**

As to the second element of the defense, there is no question that
Plaintiff "unreasonably failed to take advantage of any preventive or
corrective opportunities provided by" Food Lion.  Plaintiff directs the Court
to his amended complaint as evidence that he tried to take advantage of
the anti-harassment policy, wherein he states: (1) "Plaintiff specifically
complained to Store Manager Brandt that Pegg was mistreating him due to
his race.  Brandt, however, failed to take any action whatsoever in
response to Plaintiff's complaints[;]" (2) "Plaintiff also complained to
Grocery Manager Rich Redmon during the first few weeks of his
employment that Assistant Manager Pegg was treating Plaintiff differently
due to his race.  Like Brandt, Redmon failed to take any action whatsoever
in response to Plaintiff's complaints[;]" and (3) "Plaintiff also complained to
at least two other managerial employees during the first few weeks of his
employment that Pegg was mistreating him, but these employees also
failed to take any action whatsoever in response to Plaintiff's complaints."
**Plaintiff's First Amended Verified Complaint, ¶¶ 21-23.**  However, these

statements were *completely contradicted* by Plaintiff in his deposition testimony.[5]

> Q. Did you ever complain to anybody at Food Lion that Kim Pegg was discriminating against you on the basis of race, because you were a black man?
>
> A. No.  No.  Like I said, up until I got, up until Josh told me what he told me I wasn't sure what was going on.  All I knew is I was just, I was getting the run-around.

**Daugherty Deposition, Vol. 1, at 157.**  Plaintiff made the same admission again when asked specifically if he told manager Elaine Owen (who appears to be the "other managerial employee" referred to in Plaintiff's amended complaint) that he was being mistreated or discriminated against because of his race.

> Q. Did you tell Elaine Owen that you thought the reason [for] Kim's behavior was because you were black?

---

[5] In addition to the *direct* contradiction, Plaintiff's own time line of events makes clear that he could not have complained to management about discrimination consistent with the statements in his complaint.  If Plaintiff did not suspect race was involved until Josh Ryall "told [him] what he told [him]," which did not occur until February 2004, Plaintiff clearly was not complaining about racial discrimination/harassment "during the first few weeks of his employment," which would have been in November 2003.  ***See*, Ryall Deposition, at 52 (told Plaintiff about racial epithets in February 2004); Daugherty Deposition, Vol. 1, at 23 (began work in November 2003); Plaintiff's First Amended Verified Complaint, ¶¶ 21-23 (Plaintiff reportedly complaining of race discrimination/harassment during the first few weeks at Food Lion).**

A. No, I did not tell her that.

***Id.*, Vol. 1, at 146.** Plaintiff cannot create a material issue of fact by simply submitting contradictory sworn statements. ***Rohrbough*, *supra.***

Similarly, Plaintiff's statements in his verified complaint regarding an attempt to utilize the Food Lion hotline are directly contradicted by his deposition testimony. ***See*, Plaintiff's First Amended Verified Complaint, ¶ 32.**

> Q. Mr. Daugherty, back on the record, and you're reminded you're under oath. I'm going to show you for a second Exhibit Number 4 that you've identified as your Associate Handbook that you received earlier. The Food Lion contact information page, are those the numbers? Are those some of the number that you tried to call?
>
> A. *No*.

**Daugherty Deposition, Vol. 1, at 186 (emphasis added).**[6] In fact, while Plaintiff's verified complaint states unequivocally that he attempted to call "Defendant's toll free hotline number for reporting discrimination complaints," he actually has no idea what number he called. **Plaintiff's**

---

[6] The hotline number provided on the "Food Lion Contact Information" page is the same as the number listed in the "Complaint Procedure" section of the Handbook. ***See*, Exhibit 4 to Daugherty Deposition, at 2, 17.**

**First Amended Verified Complaint, *supra*; Daugherty Deposition, Vol. 1, at 108 (describing the number simply as a "1-800 number").**  Again, Plaintiff cannot create a material issue of fact simply by pointing to one sworn statement that is contradicted by another.  ***Rohrbough, supra.***  The record evidence establishes that Plaintiff "failed to utilize the company's complaint procedure," and such is sufficient "to satisfy 'the company's burden under the second element of the defense.'"  ***Matvia*, 259 F.3d at 268 (quoting *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 267 (4th Cir. 2001)).**

Plaintiff has failed to establish a sufficient basis upon which to hold Food Lion responsible for any harassment.  Even if Plaintiff had established the third element of his *prima facie* case, his claim would still fail based on his inability to establish the fourth element of the *prima facie* case.

Finally, the Magistrate Judge found that "defendant has clearly and unequivocally shown that any actions it took as to plaintiff's employment were based on his own request . . . or on legitimate business need," and that Plaintiff failed to carry his burden of proving that these proffered reasons were mere pretext in as much as "[he] has offered nothing more

than his own speculation[.]" **Memorandum and Recommendation, at 24-26.**

Plaintiff has offered no direct objection, labeled as such, to this independently-sufficient basis for granting summary judgment in favor of Defendant. *See*, **Plaintiff's Objections, at 6-8.** However, because one of the Magistrate Judge's express findings relates to Plaintiff's reduction in hours and Plaintiff objects to this finding made in the "Background" section of the Memorandum and Recommendation, the Court will consider Plaintiff as having challenged that specific portion of the Magistrate Judge's finding that Defendant proffered legitimate non-discriminatory reasons for its reduction of Plaintiff's hours and he has failed to show that such reasons were mere pretext. Having considered such argument, however, the Court agrees with the Magistrate Judge's findings.

The record evidence shows that Plaintiff's hours were reduced as a result of a combination of (1) his complaints regarding the number of hours he was working, (2) the end of "the holiday rush," and (3) that beginning in January 2004, Store #2588 was receiving reduced shipments of goods because of its failure to meet business expectations and ceased operating as a 24-hour Food Lion store in May 2004. *See*, **Plaintiff's First**

**Amended Verified Complaint, ¶ 25 ("during the holiday rush, Pegg assigned shifts such that Plaintiff was required to work over forty hours per week. Following the holiday rush, however, Pegg began to reduce drastically Plaintiff's hours[.]"); Daugherty Deposition, Vol. 1, at 76; Exhibit 39 *attached to* Daugherty Deposition, at 135, 156.** As the Magistrate Judge found, it is clear that Plaintiff's working hours were reduced based on his own complaints of having to work too many hours, and Defendant simply acquiesced to his complaints.[7] **Memorandum and Recommendation, at 22, 24-25.**

In addition, despite Plaintiff's characterization of "drastic" reductions in his hours and his representations to the EEOC that his hours were "cut by approximately eight to sixteen hours week after week," Plaintiff's time-sheet records reveal that prior to his late-February/early-March medical leave there was only *one* week he worked less than 33 hours, and only three weeks in which he worked 37 hours or less. Furthermore, when

---

[7] Interestingly enough, having complained to the EEOC that Defendant was discriminating against him by scheduling him for *more* than 40 hours per week (or, as Plaintiff characterized it, Kim Pegg's attempts to "wear [Plaintiff] down with excessive hours"), Plaintiff now comes to this Court and asserts that it was discrimination to schedule him for *less* than 40 hours per week. **See, Exhibit 15, *attached to* Daugherty Deposition.**

Plaintiff returned from his medical leave in April 2004, he worked approximately 40 hours per week every week except for two weeks, one of which was his last week of employment. He worked this full-time schedule even after the store ceased operating 24 hours per day. *See*, **Exhibit 32,** *attached to* **Daugherty Deposition; Affidavit of Jeffrey Brandt, filed September 30, 2005, ¶ 17.**

As the Magistrate Judge concluded, Plaintiff has done nothing to establish that the legitimate, non-discriminatory reasons given for reducing Plaintiff's hours – his complaints regarding the number of hours he was working and business necessity – were merely pretext for discrimination. Therefore, even if Plaintiff had met his burden in regards to his *prima facie* case, Defendant would be entitled to summary judgment in its favor. The Court finds this to be a third alternative basis for the granting of summary judgment in favor of Defendant as to any claim premised on a hostile work environment.

### 2. Racial Discrimination

"[U]nder the *McDonnell Douglas* framework, a Title VII plaintiff relying on indirect evidence must establish" four elements to make out a *prima*

*facie* case of racial discrimination. ***Miles v. Dell, Inc.*, 429 F.3d 480, 485 (4th Cir. 2005).** Plaintiff must show that (1) he is a member of a protected class; (2) he was, at the time of the adverse employment action, performing his job duties at a level that met his employer's legitimate expectations; (3) he was subjected to an adverse employment action; and (4) his position either remained open or was filled by similarly qualified applicants outside the protected class. ***Id.*** The Magistrate Judge found that Plaintiff failed to establish the third and fourth elements of the *prima facie* case for such a claim. ***See*, Memorandum and Recommendation, at 19-24.**

Plaintiff argues that he has satisfactorily established he was subjected to an "adverse employment action." In regards to this element, Plaintiff's objections are aimed at the Magistrate Judge's (1) statements concerning the existence or non-existence of the position of "night manager," (2) his statements regarding Plaintiff's non-receipt of keys, and (3) his findings regarding ostracism, reduction of Plaintiff's hours, and "assigning Plaintiff more work than his coworkers." **Plaintiff's Objections, at 7-8.**

> "An adverse employment action is a discriminatory act which adversely affects the terms, conditions, or benefits of the

plaintiff's employment." *James* [*v. Booz-Allen & Hamilton, Inc.*], 368 F.3d [371,] 376 [4th Cir. 2004) (internal quotation omitted). It is well-settled that unlawfully motivated ultimate employment decisions – hiring, discharging, refusing to promote, etc. – constitute adverse employment actions, because they have a direct impact on the terms, conditions, and benefits of employment. However, discriminatory conduct can sometimes constitute an adverse employment action, even where the plaintiff is not affected by an ultimate employment decision. *Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th Cir. 2001). For discriminatory conduct that falls short of an ultimate employment decision to qualify as such, that conduct must detrimentally impact the material terms of the plaintiff's present employment or [his] prospect for advancement. *See James*, 368 F.3d at 375.

It must also be remembered that the "terms, conditions, or benefits of a person's employment do not typically, if ever, include general immunity from the application of basic employment policies or exemption from [an employer's] disciplinary procedures." *Von Gunten*, 243 F.3d at 869.

***Lyle,*** **2006 U.S. App. LEXIS 6025, at \*13-14.**

Plaintiff first argues that the Magistrate Judge erred in "ignor[ing] Plaintiff's evidence that the position of night manager did indeed exist as shown by the testimony of three individuals other than Plaintiff." **Plaintiff's Objections, at 7.** Plaintiff's evidence in this regard consists of the deposition testimony of Jason Gravley, Joshua Ryall, and Tracy Reynolds – each of whom was either a grocery stocker or a cashier – that they were told Plaintiff was the "night manager" and/or otherwise heard him referred

to in that manner.  However, the fact that a stocker and two cashiers referred to Plaintiff as "night manager," were told that he was "night manager," or heard others reference him in such manner, does not establish that the position of "night manager" *actually existed as a distinct position within the Food Lion corporation* anymore so than if they had been told that he was the "night president" or "night commander" of the Brevard Food Lion store.  In fact, even *Plaintiff* testified under oath that he did not believe the position of "night manager" actually existed.  **Daugherty Deposition, Vol. 1, at 69-70.**  Further, there is no question that Plaintiff was a "PIC-approved" (Person-in-Charge) person, and Plaintiff's own counsel stated to the Deputy Commissioner overseeing Plaintiff's workers' compensation hearing that "PIC-approved" and "night manager" "*is a distinction without a difference*."  **Exhibit 39, *attached to* Daugherty Deposition, at 128 (emphasis added).**  Finally, the "Store Operation" section of the Food Lion Associate Handbook, provides only for Store Managers, Assistant Managers, and Department Managers, with no reference to the position of "night manager."  ***See*, Exhibit 4, *supra*, at 33 (describing the responsibility of various managers, but containing no reference to a "night manager").**

Given such evidence, there was no error in the Magistrate Judge's finding that the position of "night manager" did not actually exist within the Food Lion corporation. Similarly, there was no error in his finding that Plaintiff never received a decrease in his job title inasmuch as he "applied for and received the position of 'stocker,' and that based on Brandt's confidence in plaintiff, he was chosen to be a 'Person-in-Charge[,]'" and "was at all relevant times . . . known as a "Person-in-Charge."

**Memorandum and Recommendation, at 20.**

Plaintiff also asserts that his non-receipt of keys to the Brevard Food Lion store was an adverse employment action based on his race. His *sworn testimony* at his deposition, however, was that he believed he did not receive a set of keys to the Brevard Food Lion store *only* because the position of "night manager" did not exist.

> A. [M]y biggest complaint in this whole thing is that [Jeff Brandt], me and him entered into a contract, a verbal contract. He offered me a job and then later on down the road when he found out that this is not a job, you know, he was just completely evasive . . .
>
> Q. Do you think what happened is Jeff Brandt found out there was no such position at Food Lion?
>
> A. I think that's exactly what happened.
>
> Q. And then he didn't give you the keys or any of - -

A. I think he stuck his foot into something he wasn't certain about and then found out, boom.

Q. And that's the only reason he didn't give you keys?

A. That's the only reason.  Which he should've told me instead of always giving me the run-around or evading me.  He should've just simply come out and told me, you know, [t]his position don't exist, I'm sorry I hired you for a position that don't exist.

**Daugherty Deposition, Vol. 2, at 69-70.**  Given Plaintiff's own testimony,

his objection warrants no further discussion.[8]

---

[8] The Court will note, however, that Plaintiff's statements in his November 10, 2005, affidavit regarding his non-receipt of keys is of no value.  First, the affidavit constitutes at least his third different sworn statement regarding the keys.  In his first February discrimination charge filed with the EEOC, he discussed his non-receipt of keys as part of the racial discrimination to which he was being subjected.  Secondly, his subsequent deposition testimony was that his non-receipt of keys was not racially motivated at all.  And third, he claims that having heard the testimony of Jason Gravley, he is *now* convinced that the non-receipt of keys was racial discrimination.  ***See*, Exhibit 15, *attached to* Daugherty Deposition; Daugherty Deposition, Vol. 2, at 69-70; Plaintiff's Affidavit, ¶10.**

Second, and no less troubling than his repeatedly-changing sworn testimony, is the fact that his new-found belief is based on deposition testimony *that does not exist*.  ***See*, Plaintiff's Affidavit, at ¶ 10 (claiming that his belief is based on Gravley's testimony "that Jeff Brandt used the "N" word constantly"); Gravley Dep., at 24-25 (wherein Jason Gravley's actual testimony is that he only heard Brandt used the "N" word on one occasion).**

Plaintiff's third objection regarding adverse employment action is that the Magistrate Judge erred in "not address[ing] the significance of the ostracism being not from coworkers but from Plaintiff's immediate supervisor." **Plaintiff's Objections, at 7-8.** Plaintiff testified that while he never had an argument, conflict, or disagreement with Kim Pegg, he and Kim Pegg "couldn't communicate," and she would ignore him and "refuse to make eye contact with him." **Daugherty Deposition, Vol. 2, at 31; Exhibit 15, *attached to* Daugherty Deposition.** Other than this generally unfriendly behavior between the two, Plaintiff could identify nothing that Kim Pegg did to him that would qualify as racial discrimination. **Id., at Vol. 1, at 146-47.**

This sort of unfriendly, rude behavior, even by a supervisor, is insufficient under Title VII. **See, e.g., Baqir v. Principi, 434 F.3d 733, 747 (4th Cir. 2006) (rude treatment, even by a supervisor, is not enough to sustain a hostile work environment claim); Combs-Burge, 2006 WL 694381, at *4 ("Finally, although [Plaintiff] alleges that [her supervisor] was more friendly to white employees than to her, general complaints of rude treatment are not sufficient to sustain a hostile work environment claim.").** Title VII does not guarantee a perfect

workplace, perfect coworkers, or perfect relationships between coworkers, and the "ostracism" and "shunning" by Kim Pegg of which Plaintiff complains is simply insufficient to sustain a Title VII claim.[9]

Plaintiff also claims that he was subjected to an adverse employment action in that his hours were reduced and he was forced to perform more labor than his co-workers because of his race. Plaintiff's claim regarding the reduction of his hours has been previously addressed and rejected. As to Plaintiff's claim of "excessive labor" because of his race, such claim is simply unsupported by the record evidence as discussed *supra*.

For the foregoing reasons, the Court finds Plaintiff's objections regarding the third element of his *prima facie* case to be without merit and that he has failed to sufficiently establish such element. Consequently,

---

[9] Furthermore, Plaintiff's own testimony was that Kim Pegg had problems with other (white) employees. For example, he testified that when he told Elaine Owen that he and Pegg were not getting along, she responded that Kim Pegg was a "bitch," and that she and Pegg "almost came to blows." **Daugherty Deposition, Vol. 1, at 146;** *see also***, Gravley Deposition, at 47 (testifying that Kim Pegg and Brian Frady did not get along well).** Given such testimony and if rude treatment was sufficient to establish a hostile work environment, Plaintiff's claim would still fail because he has not established that Pegg's rude treatment of him was based on his race rather than on what appears to be a general inability by her to get along well with others.

Defendant is entitled to summary judgment in its favor on Plaintiff's racial discrimination claim.

As with Plaintiff's hostile work environment claim, the Magistrate Judge found that even if Plaintiff had established a *prima facie* case of racial discrimination, "defendant has clearly and unequivocally shown that any actions it took as to plaintiff's employment were based on his own request . . . or on legitimate business need," and Plaintiff failed to carry his burden of proving that these proffered reasons were mere pretext inasmuch as "plaintiff has offered nothing more than his own speculation[.]" **Memorandum and Recommendation, at 24-25, 26.** With no direct objection by Plaintiff regarding the Magistrate Judge's recommendation in this regard, and with the only tangentially related objection already discussed and rejected, the Court finds that Plaintiff's failure to establish that the legitimate, non-discriminatory reasons proffered by Defendant were mere pretext is a second, alternative basis for granting summary judgment in favor of Defendant as to this claim.

**B. Retaliation**

Plaintiff's second cause of action is for retaliation in violation of Title VII. To establish such a claim, Plaintiff must show "(1) that he engaged in protected activity, (2) that an adverse employment action was taken against him, and (3) that there was a causal link between the protected activity and the adverse action." *Greene v. A. Duie Pyle, Inc.*, **2006 WL 694377, at \*2 (4th Cir. 2006) (citing *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405-06 (4th Cir. 2005)).** A retaliation claim may be established through use of the *McDonnell-Dougas* burden-shifting method of proof, previously discussed. *See, e.g., McNairn v. Sullivan*, **929 F.2d 974, 980 (4th Cir. 1991).**

The Magistrate Judge found that Plaintiff failed to satisfy the second and third elements of a *prima facie* case of retaliation. *See*, **Memorandum and Recommendation, at 28-29.** The Magistrate Judge also found, alternatively, that even if Plaintiff had established a *prima facie* case of retaliation, "summary judgment should [nevertheless] be entered against him, inasmuch as defendant has articulated a legitimate, nondiscriminatory reason for all actions it took, to which plaintiff has not shown pretext." *Id.*, **at 29.** Plaintiff objects on multiple grounds to the Magistrate Judge's

finding that Plaintiff failed to make out a *prima facie* case.[10]  ***See,***

**Plaintiff's Objections, at 8-10.**  Plaintiff's bases for objection include the

"[a]dditional measures of accountability enforced against Plaintiff," the

"sudden decision to lock the office door," Defendant's denial of his workers'

compensation claim, and the intentional injury suffered by the Plaintiff at

the hands of the Defendant in what can be most simply referred to as the

"banana box incident."  **Plaintiff's Objections, at 8-10.**

Plaintiff offers no elaboration as to the "additional measures of

accountability" to which he refers, leaving the Court no choice but to

assume that he is referring to the lists of tasks and "case-counting" he

refers to elsewhere in his objections.  Inasmuch as the evidence is clear

that these "measures of accountability" were enforced against other

employees as well, including white employees who had not filed an EEOC

complaint, Plaintiff's argument is without merit.

Plaintiff also asserts that the locking of the office door was an

adverse employment action in retaliation for his having filed a complaint of

discrimination with the EEOC.  While locking the office door was clearly not

---

[10] To the extent Plaintiff's objections regarding his retaliation claim are premised on "excessive labor" and "shunning," such objections are rejected for the reasons discussed *supra*.

an "ultimate" employment action, such as hiring or firing, it could nevertheless constitute an "adverse employment action" if Plaintiff establishes that the action had a detrimental impact on the material terms of his employment.  **See, *Lyle*, 2006 U.S. App. LEXIS 6025, at \*14 (citing *James*, 368 F.3d at 375).**

Plaintiff's sermonizing not withstanding, he has not established that locking the office door detrimentally impacted the material terms of his employment.  **See, Exhibit 1, *attached to* Plaintiff's Affidavit (Wednesday March 3, 2004 – listing 10 "Reasons the office should remain open").**  By his own testimony, there was only one occasion on which he needed to access the office but could not because it was locked. ***See*, Daugherty Deposition, Vol. 1, at 143.**

Finally, claims of retaliation in violation of Title VII must be based on conduct occurring *as a result of* a plaintiff having engaged in protected conduct.  Plaintiff has offered nothing other than his own supposition that when the office door was first locked Defendant had any knowledge whatsoever that Plaintiff had filed an EEOC complaint (*i.e.*, his protected conduct).  He has offered no evidence from which to establish that the

office door was locked to retaliate against Plaintiff as a result of his having engaged in protected conduct.

Plaintiff next argues that Defendant retaliated against him by denying his workers' compensation claim. The evidence is clear that Defendant denied Plaintiff's workers' compensation claim not because he had previously engaged in protected activity, but because *Plaintiff informed management directly that his injury was not work related*. This objection warrants no further discussion. **See, Exhibit 1,** *supra* **(Friday, June 2, 2004 remarks – "Jeff wanted to know if this was a worker's comp injury. I told Jeff that it did not happen on the job and that it was an ongoing problem.").**

Finally, Plaintiff states that the Magistrate Judge erred in regards to his retaliation claim because "it must be taken as true for purposes of Summary Judgment that Food Lion intentionally inflicted injury upon Plaintiff in retaliation against him for complaining about racial discrimination" by placing "a banana box in such a position that Plaintiff would be injured in lifting it." **Plaintiff's Objections, at 9-10.** The "banana box incident" to which Plaintiff refers, and of which no reference appears in his "Personal Journal" of events occurring at Food Lion, is something that

"came rushing back" to Plaintiff while speaking with his attorney the day before the Industrial Commission hearing on his workers' compensation claim. *See,* **Exhibit 39,** *attached to* **Daugherty Deposition, at 36-39.**

According to Plaintiff, when he returned to Food Lion in April from his medical leave he was told to clean the back room, which was "in the worst shape [he] had ever seen it." **Plaintiff's Affidavit, ¶ 12.**

> There was a banana box on top of several boxes stacked on top of a float. I am six feet and three inches tall and I weigh approximately 300 pounds. I could barely reach the box over my head, and I could barely lift it up. I had such a hard time lifting it, I know that it had to take at least two people to put that box up there. The box was filled with glass jars of applesauce, and someone had to fill that banana box with jars of applesauce and then put it up on that float. Banana boxes are only for reclaim, and should have never been filled with jars of applesauce. Additionally, banana boxes are supposed to be stored in bunkers on one side of the back room. Also, the float should have never been stacked that high. Considering all the circumstances, there is not a doubt in my mind that that box was placed there intentionally so that I would hurt myself when I had to move it.

*Id.* This statement is the only evidence in regard to this "intentional injury" assertion by Plaintiff.

Plaintiff, as the non-movant at summary judgment, is entitled to reasonable inferences. The key word, however, is *reasonable*. Plaintiff's inference that a box being improperly used and located in a room that was

a "complete wreck" and a "disaster," was placed there by Food Lion management[11] intentionally so as to injure him is, quite frankly, not a *reasonable* inference.  **See, Exhibit 39, *supra*, at 57; *see also, Griffin v. Smithfield Foods, Inc.*, 183 F.Supp.2d 824, 826-27 (E.D. Va. 2002) ("'[I]t is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests upon speculation and conjecture.'" (quoting *Ford Motor Co. V. McDavid*, 259 F.2d 261, 266 (4th cir. 1958))).**

Finding none of Plaintiffs objections to be of any merit, the Court agrees with the Magistrate Judge that Plaintiff has failed to carry his burden of making out a *prima facie* case of retaliation.

The Magistrate Judge also concluded that even if Plaintiff had established a *prima facie* case of retaliation, he had failed to establish that the legitimate reasons proffered by Defendant were mere pretext.  Plaintiff offers no direct objection to this alternative basis for summary judgment. Further, the only objection that is even tangentially related to this basis has

---

[11] Plaintiff specifically identified, on "information and belief," Kim Pegg and/or Rich Redmon as the persons who placed the box in a way so as to intentionally injure him.  **Plaintiff's First Amended Verified Complaint, ¶ 46.**

been previously addressed and rejected.  Therefore, the Court finds that Plaintiff's failure to establish that the legitimate non-discriminatory reasons proffered by Defendant were mere pretext is a second, independent basis for granting summary judgment in favor of Defendant as to Plaintiff's retaliation claim.

## C. Wrongful Discipline

Plaintiff's fifth cause of action is for wrongful discipline in violation of 42 U.S.C. § 1981.  Plaintiff states only that he "incorporates all its [sic] discussion *supra* of the actions of Defendants [sic] in arguing that wrongful discipline did exist in this case."  **Plaintiff's Objections, at 10.**  This is not a proper objection.  ***See, Diamond, supra*; *Thomas, supra*.**  Nevertheless, the Court will look to Plaintiff's complaint for the actions of which he complains, and briefly address the contention that he was wrongfully disciplined.

Plaintiff states in his complaint that Defendant wrongfully "disciplined Plaintiff in [1] forcing him to work trucks by himself, [2] in counting his cases, [3] in forcing him to make and maintain a list regarding his assigned duties, and [4] in ultimately forcing Plaintiff to perform excessive labor to

the point that Plaintiff suffered physical injury." **Plaintiff's First Amended Verified Complaint, ¶ 84.** Plaintiff alleges on "information and belief" that "Defendant did not similarly discipline white employees[,] although white employees were less productive than Plaintiff," because these other employees were white. *Id.*, **¶¶ 84-85.**

The evidence adduced in this case offers no support for Plaintiff's claim that he was wrongfully disciplined because of his race. Rather, the evidence reveals that: (1) other (white) employees were made to work trucks by themselves; (2) other (white) employees had their cases counted[12]; and (3) other (white) employees were made to maintain lists regarding work assignments. **Brandt Affidavit, ¶ 9 (list of tasks); Exhibit 39, *supra*, at 109, 111-13 (Randy working trucks by himself), at 153 (Rich Redmon discussing cases being counted for all stockers), at 157 (Redmon discussing Plaintiff's treatment compared to other stockers); Exhibit 28, *attached to* Daugherty Deposition, at 10 (Randy Nicholson being given the exact same work to do); Gravley Deposition, at 52 (to-do lists); Ryall Deposition, at 45 (to-do lists).**

---

[12] In addition, Plaintiff admitted that his cases were only counted on one occasion, near the end of his time of employment. ***See*, Daugherty Deposition, Vol. 1, at 162-63.**

Finally, while Plaintiff alleges on "information and belief" that he was wrongfully disciplined by Defendant "ultimately forcing [him] to perform excessive labor to the point that [he] suffered physical injury," the *evidence* simply does not support such allegation.  Rather, it shows that Plaintiff informed Kay Chapman, the claims adjuster investigating his workers' compensation claim, that "[Randy Nicholson] was also a night cashier which . . . *the two nights that I was off Randy did the work that I had to do* which they more or less assigned him the same work but the only difference is Randy didn't finish the work . . . ." **Exhibit 28, *supra*, at 10 (emphasis added).**  Randy Nicholson's sworn testimony at Plaintiff's workers' compensation hearing is identical to Plaintiff's remark to the claims adjuster, with Nicholson testifying that he saw no difference in the tasks he was assigned as compared to those assigned to Plaintiff.

> Q. During all this time that you worked with Mr. Daugherty, did you ever see him treated any differently in terms of the tasks he was assigned to do, as far as stocking, than you were when you stocked?
>
> A. Are you talking about the work that he was told to do?
>
> Q. Yes, sir.  Did you all do the same thing?
>
> A. Yes.
>
> Q. Was there any difference?

A. No.

Q. Did you see anything that made you think he was assigned any different tasks or his job was changed in any way that everybody else's job wasn't changed.

A. No. . . .

*                *                *

Q. All the things that you heard Mr. Daugherty describe that he did in terms of unloading pallets, down-stacking, stocking on the aisles, back-stocking, reclaiming, are those all things that you regularly did when you were assigned to work as a stocker too?

A. Yes.

Q. Did you do all the very same things: lifting things of different sizes, different positions, all that?

A. Yes.

**Exhibit 39,** *supra***, at 111-12.** Finally, Rich Redmon, in his sworn testimony at the same hearing, testified that Plaintiff was not given any tasks or treated any differently than any other stocker. *Id.***, at 157.** Plaintiff's unsupported allegation that on "information and belief" he was wrongfully disciplined based on his race through excessive labor is simply insufficient to rebut the above-cited testimony, and Plaintiff's objection is without merit.

## D. Racial Discrimination in Violation of the NCEEPA

Finally, Plaintiff's sixth cause of action is for racial discrimination in violation of the North Carolina Equal Employment Protection Act (NCEEPA). Plaintiff states that he "stands by his recitation of case law in his Memorandum in Opposition to Summary Judgment, arguing that North Carolina courts have accepted that the NCEEPA can form the basis of a wrongful discharge claim." **Plaintiff's Objections, at 10.** First, as with his objection regarding wrongful discipline, this is an improper and insufficient objection. ***See, Diamond, supra***; ***Thomas, supra***. Second, even if Plaintiff had provided a proper objection, same would be rejected for the reason stated by the Magistrate Judge, "such a claim simply does not exist." ***See***, **Memorandum and Recommendation, at 30;** ***Whitt v. Harris Teeter, Inc.***, **165 N.C. App. 32, 43, 598 S.E.2d 151, 159 (2004) (McCullough, J., dissenting) ("Because I disagree with the majority's conclusion that the claim of constructive discharge based upon either a hostile work environment or in retaliation is authorized under the public policy exception to the employee-at-will doctrine . . . I respectfully dissent."),** ***rev'd***, **359 N.C. 625, 614 S.E.2d 531, 532 (2005) ("For the reasons stated [by Justice McCullough] in the dissenting**

opinion, the decision of the Court of Appeals is reversed."); *Cline v. Dahle*, 149 N.C. App. 975, 563 S.E.2d 307 (table), 2002 WL 857552, at ***7 (2002) ("Though [the NCEEPA] exists, our courts have never found that violation of the NCEEPA creates a private right of action."); *Bendross v. Town of Huntersville*, 159 N.C. App. 228, 582 S.E.2d 726 (table), 2003 WL 21649354, at ***3 (2003) ("[P]laintiff has cited no authority showing that a private cause of action exists under the [NCEEPA]. While our state courts have not expressly addressed the issue, federal courts applying the statute have held that no statutory remedy exists."); *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000) ("Neither the North Carolina Supreme Court nor the North Carolina Court of Appeals has recognized a private cause of action under the NCEEPA.").

## IV. ORDER

IT IS, THEREFORE, **ORDERED** that the Defendant's Motion for Summary Judgment is hereby **GRANTED**. A Judgment is entered contemporaneously herewith.

52

Signed: June 13, 2006

Lacy H. Thornburg
United States District Judge